Richard Leo Anthony OCCHINO, Appellant,

v.

NORTHWESTERN BELL TELEPHONE COMPANY, State of Minnesota, Department of Public Service, American Telephone and Telegraph Corporation, Betty L. Ware and Robert W. Carlson, Appellees.

No. 81–2149.

United States Court of Appeals, Eighth Circuit.

Submitted April 8, 1982.

Decided April 14, 1982.

Certiorari Denied June 21, 1982. See 102 S.Ct. 2971.

Richard L. A. Occhino, pro se.

Warren R. Spannaus, Atty. Gen., State of Minn., Jean E. Heilman, Asst. Atty. Gen., James E. Lackner, Sp. Asst. Atty. Gen., Saint Paul, Minn., for appellees State of Minnesota, Dept. of Public Service, Betty L. Ware and Robert W. Carlson.

Richard J. Leighton, Edward T. Fride of Hanft, Fride, O'Brien & Harries, P. A., Duluth, Minn., for appellees Northwestern Bell Tel. Co. and American Tel. and Tel. Corp.

Before BRIGHT and HENLEY, Circuit Judges, and STEPHENSON, Senior Circuit Judge.

PER CURIAM.

Plaintiff-appellant Richard Lee Anthony Occhino seeks review of the district court's [1] September 11, 1981 decision which: (1) granted defendant Northwestern Bell Telephone Company's motion for summary judgment; (2) granted defendant American Telephone and Telegraph (AT&T) Corporation's motion for summary judgment; (3) dismissed Occhino's claims against the Minnesota Department of Public Service and its employees Betty L. Ware and Robert W. Carlson; and (4) dismissed Occhino's complaint, in its entirety, with prejudice. The essence of Occhino's allegations in the district court was that Northwestern Bell and AT&T terminated his telephone service without affording him notice and a hearing. Occhino alleged that his telephone service was terminated in violation of his constitutional rights of due process and equal protection as well as 42 U.S.C. §§ 1981, 1982, 1983 and 1985.[2] Occhino also claimed that the Minnesota Department of Public Service improperly refused to afford him a

hearing on his telephone termination. For the reasons set forth below, we affirm the district court's judgment.

I

In February of 1980, Northwestern Bell began to receive complaints from employees of the Duluth, Minnesota *Herald & News—Tribune* that Occhino had been placing abusive and profane telephone calls to the newspaper. On February 8, 1980, John McMillion, publisher of the Duluth *Herald & News—Tribune*, wrote a letter to Occhino in which he objected to an evening telephone call Occhino placed to McMillion's home on February 7, 1980, during which Occhino "cursed" McMillion's daughter. Occhino's dissatisfaction with the newspaper and its employees apparently arose from the *Herald & News—Tribune*'s failure to publish an article about a civil lawsuit with which Occhino was involved.

On February 14, 1980, Thomas R. Wilson of Northwestern Bell wrote Occhino a letter which, after stating that Northwestern Bell had received a complaint from the Duluth *Herald & News—Tribune*, warned Occhino that if he did not cease using his telephone to place abusive and profane calls which interfere with the newspaper's desired use of telephone service, "it may be necessary for Northwestern Bell to take further action including interruption of your [Occhino's] telephone service."

Despite this February 14, 1980 warning, Occhino continued to place harassing telephone calls to McMillion. After Occhino again telephoned McMillion on April 8, 1980, Northwestern Bell disconnected Occhino's telephone service.

In this case, Occhino, acting pro se, apparently invoked federal jurisdiction under both section 1331(a) and section 1343. As will be seen, *infra*, analysis of the substantive rights involved in this case is similar whether the right claimed is pursued directly under the constitution and section 1331(a) or via a federal civil rights statute and its jurisdictional counterpart, section 1343. Keeping this difference in mind, we will analyze Occhino's claims separately in the pages which follow.

---

1. The Honorable Robert G. Renner, United States District Judge for the District of Minnesota.

2. A litigant may bring suit in federal court claiming a constitutional violation directly under the general federal question jurisdiction conferred by 28 U.S.C. § 1331(a). In addition, a litigant may bring suit in federal court claiming a violation of certain federal civil rights statutes under the jurisdiction conferred by 28 U.S.C. § 1343.

After his telephone was disconnected, Occhino complained to various Northwestern Bell personnel. He made several visits to the Duluth offices of Northwestern Bell during which he frequently used loud, abusive and profane language. On three occasions, Duluth police officers removed Occhino from the Duluth Northwestern Bell offices because of his boisterous conduct and refusal to leave when so requested.

On December 23, 1980, Gregory A. Ludvigsen, an attorney for Northwestern Bell, wrote Occhino a letter in which he offered to restore, without any charge for reconnection, Occhino's telephone service on December 29, 1980. That offer was subject to a condition, however, that Occhino's service "could be disconnected again if Northwestern Bell receives complaints that you [Occhino] use your telephone to make calls that interfere with the telephone service of others or use foul or profane language over the telephone and Northwestern Bell's investigation shows these complaints are true." Occhino refused that offer.

On May 1, 1981, Occhino filed a pro se complaint in the United States District Court for the District of Minnesota. Although it is difficult to decipher, the complaint alleged that Occhino's telephone service was terminated in violation of Occhino's due process and equal protection rights under the Fourteenth Amendment. Occhino particularly alleged that he was entitled to notice and a hearing before telephone service could be terminated and that the denial of these due process rights entitled him to relief under 42 U.S.C. §§ 1981, 1982, 1983 and 1985. Northwestern Bell, AT&T and the Minnesota Department of Public Service were named as defendants and were all charged, somehow, with denying him notice and a hearing before or after his

telephone service was suspended. On May 5, 1981, Occhino filed an amended complaint which added two employees of the Minnesota Department of Public Service, Betty L. Ware and Robert W. Carlson, as additional defendants. Occhino alleged that Ware and Carlson participated in denying him a hearing with respect to the termination of his telephone service.

After the defendants filed answers and various motions to dismiss,[3] the case was referred to United States Magistrate Patrick J. McNulty. On August 28, 1981, after conducting a hearing on the matter in Duluth, Magistrate McNulty filed a lengthy report and recommendation which concluded that: (1) defendants Northwestern Bell and AT&T were entitled to summary judgment in their favor; and (2) Occhino's claims against the Minnesota Department of Public Service and its employees Ware and Carlson should be dismissed. On September 11, 1981, the district court adopted the magistrate's report and recommendation and dismissed Occhino's complaint with prejudice.

II

For clarity, Occhino's claims and legal theories will be discussed separately.

(A) Claims Against Defendant AT&T

In naming AT&T as a defendant, Occhino apparently concluded that AT&T was necessarily responsible for the acts of Northwestern Bell because AT&T owns the stock of Northwestern Bell.[4] However, Occhino failed to specify any action or inaction by AT&T with respect to the termination of his phone service. Even construing Occhino's pro se allegations broadly, as we must, it is clear that Occhino made no allegations

3. On June 29, 1981, Northwestern Bell and AT&T filed a motion for a preliminary injunction to enjoin Occhino from threatening, harassing, intimidating or annoying any agents or employees of those companies, including members of the agents' or employees' families. Magistrate McNulty subsequently recommended, on August 13, 1981, that the motion for a preliminary injunction be granted. However, the district court apparently never ordered injunctive relief and that issue is not pursued in this court. Therefore, we will not consider any issue relating to injunctive relief.

4. Counsel for Northwestern Bell stated at the August 13, 1981 hearing that "[i]n a general sense it [AT&T] perhaps could be classified as an owner of the stock of Northwestern Bell, which is a separate corporation."

against AT&T which implicated it in the actions to which Occhino objects. The district court properly entered summary judgment in favor of AT&T.

### (B) 42 U.S.C. § 1981[5]

■ Occhino's allegations that his rights under 42 U.S.C. § 1981 were violated when his telephone service was terminated are patently meritless. 42 U.S.C. § 1981 "prohibits racial discrimination in the making and enforcement of private contracts," *Runyon v. McCrary*, 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976), and proscribes discrimination in the making and enforcement of contracts against, or in favor of, any race, including the white race, *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 286–87, 295, 96 S.Ct. 2574, 2581–82, 2585, 49 L.Ed.2d 493 (1976). Occhino, a white male, made no allegations that termination of his telephone service was due to racial discrimination. Clearly then, section 1981 is not applicable here.

### (C) 42 U.S.C. § 1982

42 U.S.C. § 1982 "bars *all* racial discrimination, private as well as public, in the sale or rental of property * * *." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968) (emphasis in original). Again, this statute is inapplicable here because Occhino made no allegations of racial discrimination with respect to the termination of his telephone service.

### (D) 42 U.S.C. § 1983

[I]n any § 1983 action the initial inquiry must focus on whether the two essential elements of a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States.

---

**5.** Parts II B–F of this opinion essentially relate to Occhino's allegations against Northwestern Bell. However, the discussion in Parts II B–F is also relevant to our separate consideration of

*Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981).

■ In this case, Northwestern Bell terminated Occhino's telephone service pursuant to its General Rules and Regulations which are on file with the Minnesota Department of Public Service. Paragraphs 5(b), 5(h) and 8(a) of those Rules and Regulations state:

5. DENIAL OR TERMINATION FOR CAUSE

The Telephone Company may either temporarily deny service or terminate the service upon:

\* \* \* \* \* \*

b. Use of foul or profane language.

\* \* \* \* \* \*

h. Use of service in such a way as to interfere with the service of other subscribers.

\* \* \* \* \* \*

8. DISCONNECTION FOR INTERFERENCE WITH TELEPHONE SERVICE OF OTHER SUBSCRIBERS

The Telephone Company may disconnect, without advance notice:

a. Any telephone which is used in such a manner as to interfere with the service of other telephone users.

Northwestern Bell's Rules and Regulations govern the manner in which the company provides service to its telephone subscribers. As discussed in Part III, *infra*, Northwestern Bell is regulated by two Minnesota state agencies: the Department of Public Service and the Public Service Commission. Those state agencies monitor telephone utilities to insure that reasonable and adequate service is provided in an equitable manner.

As just stated, the first prong of our analysis of a section 1983 claim is to consider whether the action complained of was taken by a person acting under color of state law. *Parratt v. Taylor, supra*, 451

---

the allegations against the Department of Public Service and its employees Ware and Carlson in Part III, *infra*.

U.S. at 535, 101 S.Ct. at 1913. "The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). The proper inquiry is "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 95 S.Ct. at 453.

Under the principles elaborated in *Jackson*, Northwestern did not act under color of state law in disconnecting Occhino's telephone. It merely enforced its own rules and regulations and the record lacks any indication that there is a sufficiently close nexus between the state of Minnesota and Northwestern Bell's actions. Accordingly, the steps Northwestern Bell took in terminating Occhino's telephone service cannot be fairly treated as that of Minnesota itself. *Accord Kadlec v. Illinois Bell Telephone Co.*, 407 F.2d 624, 626–27 (7th Cir.), *cert. denied*, 396 U.S. 846, 90 S.Ct. 90, 24 L.Ed.2d 95 (1969).[6]

Having concluded that Northwestern Bell's actions in terminating Occhino's telephone service were not effectuated under color of state law, it is clear that section 1983 is inapplicable to this case.[7]

(E) 42 U.S.C. § 1985

■ 42 U.S.C. § 1985 provides a civil remedy for conspiracies to interfere with certain civil rights. Occhino did not specify which subsection of section 1985 was allegedly violated by defendants' conduct but it is clear that Occhino failed to allege that defendants' actions were pursuant to, or in furtherance of, a conspiracy. Even construing Occhino's allegations broadly, therefore, section 1985 is plainly not applicable.

(F) Equal Protection and Due Process Claims [8]

Occhino also claims that his equal protection and due process rights guaranteed under the Fourteenth Amendment were violated when his telephone service was terminated. Section one of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The Fourteenth Amendment due process and equal protection clauses limit only state action. *E.g.*, Tribe, *American Constitutional Law* 1147 & n.1 (1978). We previously concluded that the actions of Northwestern Bell did not amount to "state action."

■ However, even assuming *arguendo* that Northwestern Bell employees acted under color of state law in terminating Occhino's telephone service, the record contains neither an allegation that Occhino was treated differently than any other person or group nor any indication whatsoever that Occhino was denied equal treatment in comparison to others. Thus, Occhino was not denied equal protection under the law.

■ Occhino's due process claim is also without merit. In considering whether a litigant was deprived of some interest in violation of the Fourteenth Amendment's

---

**6.** In contrast, *Salisbury v. Southern New England Telephone Co.*, 365 F.Supp. 1023 (D.Conn. 1973) held, for the purposes of a motion to dismiss, that a telephone company's discontinuation of an individual's telephone service constituted state action because the Connecticut Public Utilities Commission extensively supervised and regulated the state's telephone utilities. *Id.* at 1025. In our view, *Salisbury* is either distinguishable or no longer valid in light of the Supreme Court's decision in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).

**7.** Because of our conclusion on the threshold question of state action, it is unnecessary to consider at this time whether telephone service is a "property interest" under Minnesota law.to which due process procedural protections apply. *See Jackson v. Metropolitan Edison Co.*, *supra*, 419 U.S. at 348 n.2, 359, 95 S.Ct. at 452 n.2, 457. However, we nevertheless discuss that issue in Part II F, *infra*.

**8.** We treat these constitutional claims as being asserted directly under 28 U.S.C. § 1331(a). *See* n.2, *supra*.

due process clause, we must initially consider whether the litigant was deprived of a constitutionally protected interest—life, liberty or property—and, if so, what process was his due. *E.g., Logan v. Zimmerman Brush Co.,* —— U.S. ——, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).

■ The "hallmark" of a constitutionally protected property interest [9] "is an individual entitlement grounded in state law, which cannot be removed except 'for cause.' " *Id.* —— U.S. at ——, 102 S.Ct. at 1151. We find no indication in the record that Occhino had an entitlement to telephone service under Minnesota law. Moreover, the case authorities indicate that an individual does not have a constitutionally protected interest in telephone service. *See, e.g., White v. Walnut Hill Telephone Co.,* 84 F.R.D. 138, 140 (W.D.Ark.1979) (it is "undoubtedly true in the abstract" that there is no constitutional right to telephone service); *Teleco, Inc. v. Southwestern Bell Telephone Co.,* 392 F.Supp. 692, 698 (W.D.Okl.1974) (plaintiff's right to receive telephone service from Southwestern Bell "does not rise to the level of a constitutional right"); *Palma v. Powers,* 295 F.Supp. 924, 939 (N.D.Ill.1969) (it is well established that the public has no unqualified constitutional right to receive telephone service and such service may be conditioned on a variety of just and reasonable regulations).

■ Therefore, even assuming the existence of state action with respect to the termination of Occhino's telephone service, Occhino does not have an unqualified constitutional right to receive telephone service.

■ Northwestern Bell clearly warned Occhino, in a letter dated February 14, 1980, that his telephone service could be terminated if his improper use of that service was not discontinued. After that formal warning was given, Northwestern Bell received complaints from a credible source, newspaper publisher McMillion, that Occhino had persisted in placing harassing, annoying and sometimes threatening telephone calls, occasionally at irregular hours. Under its Rules and Regulations filed with the Minnesota Public Service Commission, Northwestern Bell was justified in terminating telephone service. Moreover, Northwestern Bell's subsequent offer to restore Occhino's telephone service, conditioned on an agreement to refrain from placing harassing, annoying, intimidating and profane telephone calls, evidences Northwestern Bell's good faith in this matter.

For these reasons, Occhino's equal protection and due process claims are without merit.

### III

■ For the reasons previously discussed, the district court properly entered summary judgment in favor of AT&T and Northwestern Bell. Although we also conclude that Occhino's claims against the Minnesota Department of Public Service and its employees Ware and Carlson were properly dismissed by the district court, we find it necessary to briefly discuss the state of Minnesota's role in regulating telephone service within its borders. Much of our discussion in Part II applies to Occhino's claims against the Department of Public Service and its employees Ware and Carlson. *See* n.5, *supra.* Even so, it is appropriate to touch upon some aspects which relate specifically to those state defendants.

The Minnesota Department of Public Service (DPS), which Occhino named as a defendant, is one of two Minnesota state agencies involved in regulating utility service; the other is the Minnesota Public Utilities Commission (PUC). Minn.Stat. § 216A.01 (West Supp.1982). The DPS and PUC are "vested with the same jurisdiction and supervisory power over telephone companies doing business in [Minnesota] * * *." *Id.* at § 237.02.

The Minnesota statutory scheme makes the DPS and PUC partners in regulating telephone service but, to a certain extent, prescribes different duties to each entity. In its brief in this court, the DPS states

---

**9.** There is no claim that telephone service falls within the confines of a life or liberty interest.

that "only the PUC can order or conduct a hearing on issues related to regulated utility service" and further maintains that the "DPS only has authority to informally resolve a matter through mediation or to conduct an investigation and present evidence to the PUC." [10]  The DPS stresses that under Minn.Stat. § 237.081, "the burden was placed on Occhino to file a formal complaint with the PUC, which he failed to do" and asserts that Occhino, in naming the DPS instead of the PUC as a defendant, sued "the wrong party."

Under Minn.Stat. § 237.081, the PUC may, on its own motion and presumably on the motion of an interested party, investigate any matter relating to any facet of telephone service in the state.  Subdivision two of that section states that if the PUC "becomes satisfied that sufficient grounds exist to warrant a formal hearing * * *, it shall set a time and place for a hearing." However, the DPS maintains that, unlike the PUC, it merely has the authority to *investigate* any matter subject to the jurisdiction of the DPS or PUC.[11]

The DPS's reading of the Minnesota statutes, in our view, is too grudging.  Although the DPS and PUC are distinct entities, the Minnesota statutory scheme makes them close partners in undertaking utility regulation in that state.  For example,

Minn.Stat. § 216A.095 expressly sanctions extensive cooperation between the DPS and PUC in fulfilling their statutory duties.

In arguing that Occhino sued the wrong party and erroneously failed to file a complaint with the PUC, we think the DPS misses the mark in at least two significant respects.  First, the DPS could easily have informed Occhino, who was then and is still proceeding pro se, that he had the right to request a hearing with the PUC even if the DPS found no merit to Occhino's complaints.  The DPS does not claim that it so informed Occhino nor does the record indicate that it provided such assistance.  Second, the DPS, because of its extremely close statutory and practical relationship with the PUC, simply could have asked the PUC to investigate Occhino's claims.  Occhino's heated and persistent allegations of wrongdoing with respect to the termination of his telephone service might reasonably have prompted the DPS to ask the PUC to consider Occhino's side of the story.

Be that as it may, however, we must also recognize that PUC regulations: (1) permit a telephone utility to discontinue telephone service in all cases without any hearing prior to disconnection; and (2) require notice *before* disconnection of service in only eight specific situations.[12]  Those regulations were not contravened in this case.

---

**10.** In support of these statements, the DPS cites Minn.Stat. §§ 216A.05 and 216A.07, subdivision 4, respectively.

**11.** In support of that statement, the DPS cites Minn.Stat. § 216A.07, subdivision 4.

**12.** 4 MCAR § 3.0181 A provides:
  A.  Disconnection of Service with notice— permissible reasons.  With notice a utility may disconnect service to any customer for any reason stated below.  Notice must comply with the requirements of PSC 182:
  1.  For failure of the customer to pay a bill for utility service when due.
  2.  For failure of the customer to meet the utility's deposit and credit requirements.
  3.  For failure of the customer to make proper application for service.
  4.  For a customer's violation of any of the utility's rules on file with the Commission.

  5.  For failure of the customer to provide the utility reasonable access to its equipment and property.
  ·6.  For customer's breach of the contract for service between the utility and the customer.
  7.  For a failure of the customer to furnish such service, equipment and/or rights of way necessary to serve said customer as shall have been specified by the utility as a condition of obtaining service.
  8.  When necessary for the utility to comply with any order or request of any governmental authority having jurisdiction.

  The regulations also state that when service is to be discontinued due to customer misuse of the telephone, no notice need be given by the utility.  4 MCAR § 3.0181 B provides in part:
  Disconnection of service without notice— permissible reasons.  Without notice a utility

## IV

In summary, we affirm the district court's decision to enter summary judgment in favor of AT&T and Northwestern Bell and its dismissal of the claims against the Minnesota Department of Public Service and department employees Ware and Carlson.[13]

The district court's judgment is affirmed.

may disconnect service to any customer for any reason stated below:

\*   \*   \*   \*   \*   \*

2. In the event of a condition determined to be hazardous to the customer, to other customers of the utility, to the utility's equipment, the public, or to employees of the utility.

3. In the event of a customer's use of equipment in such a manner as to adversely affect the utility's equipment or the utility's service to others.

13. In affirming the district court's judgment, we recognize that summary judgment is an extreme remedy, *Keys v. Lutheran Family and Children's Services*, 668 F.2d 356, 357–58 (8th Cir. 1981), and that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief, *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). After careful review of the record, we conclude that these standards are satisfied in this case.