827 F.2d 1291
 56 USLW 2189
 CARLIN COMMUNICATIONS, INC., a New York corporation,
Sapphire Communications, Inc., an Arizona
corporation, Plaintiffs-Appellees,
v.
The MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, a
Colorado corporation, Defendants-Appellants.
 No. 85-2797.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 14, 1987.
Decided Sept. 14, 1987.
As Amended on Denial of Rehearing and Rehearing En Banc Dec. 7, 1987.
 
 David A. Henderson, Louis J. Hoffman, Phoenix, Ariz., Lawrence E. Adelman, Norman Beier, New York City, for plaintiffs-appellees.
 Ruth V. McGregor, Nancy L. Rowen, Phoenix, Ariz., for defendants-appellants.
 Appeal from the United States District Court for the District of Arizona.
 Before SNEED, ALARCON and CANBY, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 Modern telephonic technology permits the pervasive transmission of vast quantities of information, as well as Shakespeare, Shaw, and smut. The essential question before us is whether a regional telephone company, despite its public utility status, may refuse to carry smut on its dial-a-message network. The district court concluded that it may not. We disagree and therefore vacate the injunction granted below.
 
 I.
 FACTS
 
 2
 Carlin Communications supplies salacious telephone messages to the public. In early 1985, appellant Mountain States Tel. & Tel. Co. (Mountain Bell) began carrying Carlin's messages on its "976" or "Scoopline" dial-a-message network, which offers the public various kinds of information such as sports updates, weather reports, and the like. Business subscribers pay Mountain Bell for a 976 line to carry their messages, specifying the price per call they wish the public to be charged. Mountain Bell collects the dial-a-message charges as part of its regular billing process and, after subtracting its own share, remits the proceeds to its 976 business subscribers.
 
 
 3
 Community reaction to Carlin's messages was strongly adverse. School officials complained to Mountain Bell about children calling Carlin's number; newspaper editorials chastised Mountain Bell for profiting from such entertainment. On May 23, 1985, a deputy attorney of Maricopa County, Arizona, wrote to Mountain Bell threatening to prosecute if the company continued to provide 976 lines to Carlin. The letter stated that Carlin's 976 service violated an Arizona statute prohibiting the distribution of sexually explicit material to minors.[1]
 
 
 4
 Mountain Bell immediately sent Carlin a notice that its service would be terminated in five days. At the same time, Mountain Bell filed a federal declaratory judgment action to determine its rights and duties. At an expedited hearing, the district court (per Copple, J.) held preliminarily that Carlin's message business did violate Arizona law and ordered Mountain Bell to proceed with its termination of Carlin's service on May 29, 1985, as scheduled. Mountain Bell did so.
 
 
 5
 Shortly thereafter, Mountain Bell's officers met and decided to adopt a policy of refusing 976 service to any company offering sexual "adult entertainment" messages, even if carrying the messages would not violate the laws of any of the various states within which Mountain Bell operates. On June 3, 1985, Mountain Bell publicly announced its new policy and voluntarily dismissed its declaratory judgment action.
 
 
 6
 Carlin brought suit against Mountain Bell both under 42 U.S.C. Sec. 1983, asserting First Amendment rights, and under Arizona public utility law. Although Carlin originally sought damages as well as an injunction, it later waived its damage claims. The district court (per Hardy, J.) granted summary judgment to Carlin on both state and federal grounds. The court ordered Mountain Bell to restore Carlin's 976 service and permanently enjoined the phone company from disconnecting Carlin on the basis of message content. Mountain Bell appeals. To explicate our differences with the district court, we will discuss Carlin's rights first under state law and then under the Constitution of the United States.
 
 II.
 DISCUSSION
 A. State Law
 
 7
 A public utility in Arizona, as elsewhere, must offer its service to "all persons alike without discrimination." Trico Elec. Coop. Inc. v. Corp. Comm'n, 86 Ariz. 27, 38, 339 P.2d 1046, 1054 (1959); see Ariz.Rev.Stat. Sec. 40-334(A).[2] The district court held below that Mountain Bell's decision to exclude "adult entertainment" companies from its 976 network violated this duty. We disagree for two reasons.
 
 
 8
 1. Is the restriction on message content a form of "discrimination"?
 
 
 9
 The principle of nondiscrimination does not preclude distinctions based on reasonable business classifications. See 1 A. Priest, Principles of Public Utility Regulations 86-87 (1969); 64 Am.Jur.2d Public Utilities Sec. 38, at 578 (1972). A relevant example of such a distinction appears in Dollar A Day Rent A Car Sys. v. Mountain States Tel. & Tel. Co., 22 Ariz.App. 270, 526 P.2d 1068 (1974). There the plaintiff challenged Mountain Bell's refusal to carry its advertisement in the yellow pages. As in our case, the refusal to carry plaintiff's message rested on an explicit content-based restriction: Mountain Bell's policy was to exclude all price advertising from the yellow pages, and the phone company had refused to print even the plaintiff's name in the directory because the name allegedly stated the price of plaintiff's product. Assuming without deciding that the nondiscrimination rule applied, the state court held that Mountain Bell's policy on price advertising and its refusal to carry Dollar A Day's advertisement did not constitute an impermissible discrimination.
 
 
 10
 Three factors were important to the court's decision in Dollar A Day. First, the challenged advertising policy was not directed arbitrarily at plaintiff but consistently applied to all. See 526 P.2d at 1072. Second, Mountain Bell had a legitimate interest in protecting itself from the liability that might arise from misquotations of price (whether deliberate or inadvertent). Id. Finally, Mountain Bell was furthering a state policy against deceptive advertising, even though its blanket rule went further than state prohibitions. See id. 526 P.2d at 1073.
 
 
 11
 Similar considerations apply here. Carlin has not been singled out for adverse treatment; on the contrary, Mountain Bell expressly resolved to exclude all "adult entertainment" messages from the 976 network. Mountain Bell faces, moreover, potential criminal liability for carrying Carlin's messages under state obscenity laws. Finally, Ariz.Rev.Stat. Sec. 13-3506 (prohibiting the distribution of sexually explicit material to minors) furnishes the same sort of public policy support for Mountain Bell's decision of which the court made use in Dollar A Day. Mountain Bell's policy here, as in Dollar A Day, is broader than the statute, which would not support a blanket prohibition of Carlin's service.[3] But the phone company's policy is clearly consonant with the public policy--protecting minors from "adult entertainment"--embodied in the statute.
 
 
 12
 Both the yellow pages and the 976 network provide a service to the public. Both carry messages from businesses to the public. Dollar A Day, even when viewed narrowly, indicates that Mountain Bell may exercise some business judgment about what messages, even lawful ones, it will carry. This strongly suggests that Mountain Bell permissibly exercised its judgment here.
 
 2. Phone Company as Broadcaster
 
 13
 Moreover, we question whether state public utility law in its traditional form makes sense as applied to Mountain Bell's 976 network. The technology of that network differs fundamentally from that of basic phone service. As pointed out above, individuals do not speak to each other on the 976 lines. Instead, "over 7,900 callers can be connected simultaneously to the same recorded message." Carlin Communication, Inc. v. FCC, 787 F.2d 846, 850 (2d Cir.1986). Under these circumstances the telephone is serving as a medium by which Carlin broadcasts its messages. The phone company resembles less a common carrier than it does a small radio station.
 
 
 14
 Once the telephone company becomes a medium for public rather than private communication, the fit of traditional common carrier law becomes much less snug. See generally CBS v. Democratic Nat'l Comm., 412 U.S. 94, 104-09, 93 S.Ct. 2080, 2087-90, 36 L.Ed.2d 772 (1973) (discussing reasons why Congress decided to exempt radio stations from common carrier status). Arizona may, of course, decide to make the phone company operate the 976 network as a content-neutral public forum open to any and all speakers. We are very reluctant, however, to infer such a principle from traditional public utility law.
 
 
 15
 We therefore decline to hold that state public utility law compels Mountain Bell to carry salacious or pornographic messages, both lawful and unlawful, on its 976 network.
 
 B. Federal Law
 
 16
 Carlin also sued Mountain Bell under 42 U.S.C. Sec. 1983, alleging a violation of its First Amendment rights. To succeed under Sec. 1983, Carlin must initially show that Mountain Bell's conduct was "state action." It is settled law that Mountain Bell's actions cannot be deemed state action simply because of the phone company's public utility status. See Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350-54, 95 S.Ct. 449, 453-55, 42 L.Ed.2d 477 (1974); Martin v. Pacific Northwest Bell Tel. Co., 441 F.2d 1116, 1118 (9th Cir.), cert. denied, 404 U.S. 873, 92 S.Ct. 89, 30 L.Ed.2d 117 (1971). The district court found state action nevertheless in both Mountain Bell's initial termination of Carlin's service and its subsequent policy decision to exclude all "adult entertainment" messages from the 976 network. We agree that state action inhered in the first decision but hold that it did not in the second. This conclusion requires us to vacate the injunction granted below.
 
 1. The Initial Termination
 
 17
 a. Was there state action?
 
 
 18
 As stated earlier, Mountain Bell was informed by a deputy county attorney that Arizona criminal law prohibited its carrying Carlin's messages on the 976 network. The deputy attorney advised Mountain Bell to terminate Carlin's service and threatened to prosecute Mountain Bell if it did not comply. With this threat, Arizona "exercised coercive power" over Mountain Bell and thereby converted its otherwise private conduct into state action for purposes of Sec. 1983. Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982). This is not a case like Occhino v. Northwestern Bell Tel. Co., 675 F.2d 220, 225 (8th Cir.), cert. denied, 457 U.S. 1139, 102 S.Ct. 2971, 73 L.Ed.2d 1358 (1982), in which the phone company without any particularized state participation terminated a customer's service for making abusive calls. The facts here are closer to Fitzgerald v. Mountain Laurel Racing, Inc., 607 F.2d 589, 598-99 (3d Cir.1979), cert. denied, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 814 (1980), where state officers actively participated in a racetrack's decision to expel a driver for violating state racing regulations. The county attorney's threat of prosecution provided the requisite "nexus" between the state and the challenged action. See Jackson, 419 U.S. at 351, 95 S.Ct. at 453.
 
 
 19
 Mountain Bell insists that it remains an unresolved question of fact whether the county attorney's letter was the real motivating force behind the termination. Even if unresolved, this factual question is immaterial.
 
 
 20
 In Peterson v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963), a city ordinance required restaurants to segregate their customers by race. As to the particular restaurateur involved, there was evidence that he knew of the ordinance but not that he segregated his customers because of the ordinance. The Court found that the segregation was state action "even assuming, as respondent contends, that the manager would have acted as he did independently of the existence of the ordinance." Id. at 248, 83 S.Ct. at 1121 (emphasis added). Simply by "command[ing] a particular result," the state had so involved itself that it could not claim the conduct had actually occurred as a result of private choice. Id. The same conclusion applies here. Cf. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 68, 83 S.Ct. 631, 638, 9 L.Ed.2d 584 (1963) (state could not argue that bookseller was free to ignore letter threatening prosecution if he continued to carry "objectionable" books).
 
 
 21
 b. Was the state action unconstitutional?
 
 
 22
 Mountain Bell asserts, in any event, that the initial termination of Carlin's service was not unconstitutional because Carlin was, as Judge Copple originally found, disseminating obscene messages to the public. We disagree on two grounds.
 
 
 23
 First, the termination of Carlin's service was an unlawful prior restraint. Even when a speaker has repeatedly exceeded the limits of the First Amendment, courts are extremely reluctant to permit the state to close down his communication forum altogether. See, e.g., Vance v. Universal Amusement Co., 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980) (per curiam) (state could not close movie theatre despite repeated showings of obscene movies); Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) (state could not shut down newspaper for repeatedly printing defamatory statements); Spokane Arcades, Inc. v. Brockett, 631 F.2d 135 (9th Cir.1980) (state could not close bookstore for selling obscene materials), aff'd mem., 454 U.S. 1022, 102 S.Ct. 557, 70 L.Ed.2d 468 (1981). Moreover, the county attorney's office issued its threat to Mountain Bell before there had been a judicial determination that any of Carlin's messages were obscene. That is precisely the kind of state action that the Court struck down as a prior restraint in Bantam Books. See 372 U.S. at 69-71, 83 S.Ct. at 638-40; see also Penthouse Int'l, Ltd. v. McAuliffe, 610 F.2d 1353, 1359-62 (5th Cir.) (in absence of previous judicial determination, threats to arrest retailers who carried certain magazines constituted unlawful prior restraint), cert. dismissed, 447 U.S. 931, 100 S.Ct. 3031, 65 L.Ed.2d 1131 (1980).
 
 
 24
 Second, Arizona's criminal statute protecting minors, the state law under which the county attorney's office threatened to prosecute Mountain Bell, cannot be constitutionally applied against Carlin's message service. The First Amendment does not permit a flat-out ban of indecent as opposed to obscene speech; the adult population may not be reduced to "hearing only what is fit for child." Butler v. Michigan, 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed.2d 412 (1957). Narrow regulations on indecent material have been upheld in the context of ordinary broadcasting in order to protect children. See FCC v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). However, Arizona's statute is not narrow, see Cruz v. Ferre, 755 F.2d 1415, 1421-22 (11th Cir.1985) (ban of all indecent material on cable television was overbroad), and the 976 service differs from ordinary broadcasting in that listeners must take deliberate steps to hear the particular kinds of messages they choose. See Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 74, 103 S.Ct. 2875, 2884, 77 L.Ed.2d 469 (1983) (distinguishing Pacifica where minors' access to messages was "less intrusive and uncontrollable"); Cruz, 755 F.2d at 1420-21 (same). We agree with the Second Circuit and with the United States Congress that a criminal law prohibiting indecent communications to minors cannot be applied against parties like Carlin or Mountain Bell unless it is narrowly drawn to suit the dial-a-message industry. See Carlin Communications, Inc. v. FCC, 787 F.2d 846, 847 (2d Cir.1986); supra note 3; cf. 47 U.S.C. Sec. 223(b)(2) (directing the FCC to issue regulations governing dial-a-message services and making compliance with such regulations a defense to federal prosecution for indecent communication to minors).
 
 
 25
 Arizona has two options in responding to Carlin's messages. It may prosecute vigorously under its obscenity laws, or it may establish a prior-review permit system with procedures that satisfy the requirements laid down in Freedman v. Maryland, 380 U.S. 51, 58-59, 85 S.Ct. 734, 738-39, 13 L.Ed.2d 649 (1965). It may not, however, simply close down Carlin's communication forum by threatening Mountain Bell with prosecution, and it may not proceed against either Mountain Bell or Carlin under its indecency laws.
 
 
 26
 c. To what remedy is Carlin entitled?
 
 
 27
 Thus the initial termination of Carlin's service was unconstitutional state action. It does not follow, however, that Mountain Bell may never thereafter decide independently to exclude Carlin's messages from its 976 network. It only follows that the state may never induce Mountain Bell to do so.[4] The question is whether state action also inhered in Mountain Bell's decision to adopt a policy excluding all "adult entertainment" from the 976 network. We hold that it did not.
 
 
 28
 2. Mountain Bell's new policy was not state action
 
 
 29
 The district court held that Mountain Bell was performing a "public function" when it acted to "protect[ ] the public from sexually suggestive messages." E.R.Supp. tab 180 at 107. On this theory Judge Hardy deemed Mountain Bell's new policy to be state action. Id. The Eleventh Circuit, however, recently decided that a very similar policy as adopted by another regional phone company did not constitute state action under the "public function" theory. Carlin Communication, Inc. v. Southern Bell Tel. & Tel. Co., 802 F.2d 1352, 1361 (11th Cir.1986). We agree.
 
 
 30
 The "public function" test for state action is satisfied only when the private actor is exercising "powers traditionally exclusively reserved" to the government. Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974) (public electricity utility was not engaged in a "public function"). It is clear from Jackson that Mountain Bell is not a state actor in the ordinary performance of its public utility business. To hold that Mountain Bell assumed a "public function" when it exercised censorship powers is illogical. No such function could be performed by the State. Censoring pornography without a prior judicial determination of its obscenity is something that states may not do; it is a thing that private parties alone--newspapers, television networks, publishers, and so on--may do. Thus such censorship cannot possibly be said to be a "power traditionally exclusively reserved" to the government.
 
 
 31
 Mountain Bell insists that its new policy reflected its independent business judgment. Carlin argues that Mountain Bell was continuing to yield to state threats of prosecution. However, the factual question of Mountain Bell's true motivations is immaterial.[5]
 
 
 32
 This is true because, inasmuch as the state under the facts before us may not coerce or otherwise induce Mountain Bell to deprive Carlin of its communication channel, Mountain Bell is now free to once again extend its 976 service to Carlin. Our decision substantially immunizes Mountain Bell from state pressure to do otherwise.[6] Should Mountain Bell not wish to extend its 976 service to Carlin, it is also free to do that. Our decision modifies its public utility status to permit this action. Mountain Bell and Carlin may contract, or not contract, as they wish.
 
 
 33
 We reverse and remand to have vacated the district court's permanent injunction.
 
 
 34
 REVERSED AND REMANDED.
 
 CANBY, Circuit Judge, dissenting:
 
 35
 Judge Sneed has written a characteristically well-focused and unencumbered opinion, and I agree with much of it. I join in his reasoning and conclusions that Mountain Bell's initial suspension of Carlin's services was infected with state action and that suppression of Carlin's messages by the state violated the first amendment. Where I part company with the majority is in its conclusion that Mountain Bell's "new" policy, adopted some ten days after the deputy county attorney threatened to prosecute Mountain Bell, was not imbued with state action. My reasons are three.
 
 
 36
 First, there is no evidence that the state has retreated from the threats that initially caused Mountain Bell to suspend Carlin's services unconstitutionally. So long as official compulsion or the threat of it remains, the subjective motives of Mountain Bell do not save its actions from the Constitution's reach. Peterson v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963).[1]
 
 
 37
 Second, it is no answer to say that the state's compulsion has ceased to exist because our decision today immunizes Mountain Bell from the unconstitutional state pressure. By that reasoning, no plaintiff could ever obtain injunctive relief against a private party on a state action theory. The very success of the lawsuit would remove the state compulsion, leaving only private action not subject to injunction. While injunctions against private parties imbued with state action are not without their problems, see Jackson v. Statler Foundation, 496 F.2d 623, 637-38 (2d Cir.1974) (en banc) (Friendly, J., dissenting from denial of rehearing en banc), we should refrain from adopting a rationale that forecloses them entirely. See Lee v. Macon County Bd. of Educ., 267 F.Supp. 458, 478 (M.D.Ala.), aff'd mem. sub nom. Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967) (continued state aid to segregated private school will render such school a state actor and subject it to state-wide segregation order). Particularly is this so when the entanglement between the private party and the state is substantial. See Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).
 
 
 38
 Third, the connection of Mountain Bell with the state is stronger than it would otherwise be because of Mountain Bell's status as a regulated utility. It is true that Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), held that the actions of a private, regulated utility do not automatically become those of the state. But the test in such cases is whether the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982). Here state legislators "encouraged," and a deputy county attorney coerced, Mountain Bell into suspending Carlin's services.[2] If that suspension can only be permitted under state utility law by the state's fashioning a service exception for sexually explicit but non-obscene messages, cf. Dollar A Day Rent a Car Sys. v. Mountain States Tel. & Tel. Co., 22 Ariz.App. 270, 526 P.2d 1068 (1974), then the state has further insinuated itself into the first amendment censorship violation. Thus, while state regulation alone would not lead to a conclusion that Mountain Bell acted as the state, that regulation under the circumstances of this case constitutes one more factor linking the state with Mountain Bell's acts of censorship. See Burton v. Wilmington Parking Authority, 365 U.S. 715, 724, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961).
 
 
 39
 For these reasons, I would affirm the district court's injunction.
 
 
 
 [1]
 Ariz.Rev.Stat. Sec. 13-3506(A) makes it "unlawful for any person knowingly to give, lend, show, advertise for sale or distribute explicit sexual material ... to minors."
 
 
 [2]
 Mountain Bell contends that it is not acting qua public utility when operating the 976 network. True, "the fact that a business or enterprise is, generally speaking, a public utility does not make every service performed by those owning or operating it a public service, with its consequent duties and burdens." City of Phoenix v. Kasun, 54 Ariz. 470, 97 P.2d 210, 213 (1939). The parties therefore dispute whether the 976 network is a "public service" within the meaning of Arizona public utility law
 Yet we find it unnecessary to resolve this dispute. Instead we assume arguendo that the 976 network is a public service, because for the reasons stated we find no unlawful discrimination in any event.
 
 
 [3]
 Just how far indecency laws designed to protect minors may be extended to the dial-a-message industry is a matter of controversy. Narrow regulation may be permissible. Cf. Carlin Communications, Inc. v. FCC, 787 F.2d 846, 848-55 (2d Cir.1986) (discussing FCC's efforts to formulate constitutionally acceptable regulations--time of day restrictions, blocking device requirements, provision of access codes, etc.--that would control minors' access to pornographic dial-a-message services while permitting adequate adult access); id. at 856 (striking down latest regulations). As we hold below, however, prosecution of either Carlin or Mountain Bell under Sec. 13-3506 in its current form would be unconstitutional
 
 
 [4]
 Except that it waived such claims here, Carlin might have been entitled to some form of retrospective relief as well
 
 
 [5]
 We do not address the situation in which a state imposes an unconstitutional condition upon the receipt of state benefits in order to coerce a public utility into pursuing a particular course of action. We therefore express no opinion on whether, in such a case, the motivation of the public utility would be relevant
 
 
 [6]
 Depending on whether Carlin's messages are legally obscene, Mountain Bell could still face criminal liability for carrying Carlin's messages. To that extent it could be said that the phone company remains subject to state pressure not to carry Carlin's messages. That Mountain Bell might yield, however, to the pressure of an otherwise valid and applicable obscenity law does not convert that law into an unlawful prior restraint. See United States v. Young, 465 F.2d 1096, 1100 (9th Cir.1972) (application of obscenity law to mailing service was no more of a prior restraint than its application to creators of the material who initiated the mailing process). Some self-censorship is an inevitable result of all obscenity laws
 
 
 [1]
 Should the state threats recede entirely at some time in the future, and should Mountain Bell otherwise be able to show its suspension of Carlin's service to be independent of the state, the injunction can be lifted. The district court retained jurisdiction to modify the injunction if necessary or appropriate
 
 
 [2]
 The presence of this coercion differentiates this case from Carlin Communication, Inc. v. Southern Bell Tel. & Tel. Co., 802 F.2d 1352, 1357 (11th Cir.1986)