IT IS HEREBY ORDERED that defendant's motion for summary judgment is GRANTED.

### ORDER

IT IS HEREBY ORDERED that the complaint filed by Madhukanta P. Soni, a/k/a Madhuben Soni, is DISMISSED.

INTEGRATED INFORMATION SERVICE, INC., et al., Plaintiffs,

v.

The MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, et al., Defendants.

No. CV. 89-0-563.

United States District Court, D. Nebraska.

Jan. 18, 1990.

---

6. Plaintiff cites *Caplan v. United States,* 877 F.2d 1314 (6th Cir.1989) in support of its position that the government had a duty to warn her if the steps or handrail created a dangerous situation. *Caplan* is inapposite to the facts of this case.

Daniel W. Evans, Domina, Gerrard, Copple & Stratton, Omaha, Neb., for plaintiffs.

Ruth Anne Evans and Robert F. Rossiter, Jr., Fraser, Stryker, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., Omaha, Neb., for defendants.

## MEMORANDUM OPINION

STROM, Chief Judge.

This matter is before the Court on plaintiff's motion for a preliminary injunction (Filing No. 3). This is an action for deprivation of Constitutional rights brought pursuant to 42 U.S.C. § 1983, for violation of the Federal Communications Act, 47 U.S.C. § 201 *et seq.*, and for violation of state law.[1] Jurisdiction of this Court is premised on 28 U.S.C. §§ 1331 and 1343. A hearing on the matter was held on December 11–13, 1989.

Plaintiffs seek an order restraining defendants from implementing a contractual provision whereby defendants will no longer provide billing management services to information providers who utilize auto-dialers.[2]

---

**1.** In briefs and argument, plaintiffs allude to violations of a consent decree between the Department of Justice and American Telephone and Telegraph Company (hereinafter AT & T), *United States v. American Tel. and Tel. Co.*, 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom., Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983) (sometimes referred as the AT & T break-up decree). The Court notes that plaintiffs have not presented a claim pursuant to that decree. Moreover, the decree deals with anti-trust issues and plaintiffs have not presented any anti-trust claim. Also, Judge Greene of the District Court for the District of Columbia has retained jurisdiction to enable any of the parties to apply to his Court for such further orders as are necessary to construe, carry out, modify or enforce the decree. *Id.* at 231. Judge Greene has also provided a mechanism by which interested persons may seek enforcement of the judgment through a request to the Justice Department. *Id.*, at 220. Plaintiffs have chosen not to pursue those remedies. Accordingly, this Court will not address plaintiffs' arguments with respect to the decree.

**2.** An *automatic dialer* (or *auto-dialer*) is a computer-operated random or sequential dialing device which dials telephones and, upon connection, plays a recorded message inviting the customer to call the information providers' 976 line.

## FACTS

Defendant US West is a holding company, the parent corporation of several regional telephone companies including defendants Mountain States Telephone and Telegraph Company, Northwestern Bell Telephone Company, and Pacific Northwest Bell Telephone Company.[3]

Plaintiffs are information providers; they provide information over the telephone for a fee. Plaintiff Dial Hollywood provides information such as "the best of the freebies" for a fee of $4.97 per call. Plaintiff Integrated Information Services (hereinafter, IIS) provides information such as how to acquire low-cost life insurance for a fee of $4.99 per call. Plaintiffs use auto-dialers to provide their services.[4] Dial Hollywood operates out of Omaha, Nebraska, and calls telephones located in Nebraska and Council Bluffs, Iowa. Plaintiff IIS has telephones located in Des Moines, Iowa, and places calls to Iowa and to the Omaha/Council Bluffs metropolitan area. Both plaintiffs engaged in a charitable operation for the benefit of the homeless in Fall, 1989.

Defendants provide a service ("976 service") whereby defendants bill the information-providers' fee to the customer (or "end-user") on the customer's telephone bill. Accordingly, the regional telephone companies provide both transport (the actual transmission of the call), billing management, and collection in connection with 976 service.

Plaintiffs contracted with defendants for provision of such service in 1987, 1988 and 1989. Beginning with the 1990 contract, or "976 Information Delivery Service Agreement," 976 service is no longer offered to information providers using auto-dialers. Information providers using auto-dialers

are still able to use US West lines, but US West will no longer provide billing services.

The regional telephone companies are prohibited, pursuant to the AT & T break-up decree, from transport of interstate telephone calls.[5] *See United States v. American Tel. and Tel.*, 552 F.Supp. at 186. The transport of interstate calls is the function of inter-exchange carriers such as AT & T, M.C.I., and Sprint, who provide a similar pay-per-call service on "900" lines. Defendants have also adopted a policy which provides that they will no longer provide billing management services for services utilizing auto-dialers on "900" lines. There was some evidence that the plaintiffs had planned to expand their businesses to other states, but that evidence was largely speculative.

The evidence shows that the policy change by the phone companies was a reaction to end-user complaints. The phone companies had received numerous complaints regarding 976 service in general and the use of auto-dialers in particular. In April, 1989, defendant US West established a committee to evaluate the problem and to devise a solution. The committee was headed by Ms. Wendy Sanko, Director of Operations for the Information Provider Marketing Unit at US West. The committee concluded that the public reacts negatively to the use of auto-dialers and that the public perceives that the phone companies are associated with the auto-dialers because charges appear on the phone companies' bills. The committee concluded that the reputations of the phone companies were being damaged and that the phone companies would no longer provide billing management services to those information providers using auto-dialers. The

---

**3.** These regional telephone companies were formerly Basic Operating Companies of AT & T and operate pursuant to the aforementioned consent decree, *United States v. American Tel. and Tel.*, 552 F.Supp. at 227–34.

**4.** Although the contractual provisions banning the use of auto-dialers were to have gone into effect on September 1, 1989, defendants have entered into an agreement allowing the plaintiffs to continue to use auto-dialers pending the

outcome of plaintiff's motion for preliminary relief.

**5.** With the exception of calls which are between states but within the same "Local Access and Transport Area" ("LATA"), for example, within a single metropolitan area which encompasses cities in different states. These calls are referred to as intra-LATA calls. Calls in the Omaha/Council Bluffs metropolitan area fit within this category.

phone companies will, however, provide magnetic tapes of the billing information to the information providers to enable them to do their own billing.

Plaintiffs contend that the phone companies were subjected to pressure from various governmental entities and state public utility commissions. There is simply no evidence of that fact. The evidence shows that Ms. Wendy Sanko was responsible for making the decision with respect to auto-dialers. Ms. Sanko testified that she was not aware of any pressure from state governments and the Court credits her testimony. In fact, the only evidence presented by plaintiffs to show state involvement were after the fact congratulatory letters, the referral of complaints to the phone companies by New Mexico and Minnesota regulatory agencies and a hearsay statement attributed to Mr. Stefan Budke, sales manager of US West, to the effect that defendants had been "kicked in the rear" by state public utility commissions to eliminate auto-dialers.[6]

Bruce Abraham, president of plaintiff IIS, and Daniel Lubell, a partner in plaintiff Hollywood Calling, Inc., testified that doing their own billing would cost more than the phone companies charged, but neither had explored alternative means of billing to see what the costs were. Mr. Abraham also testified that collection would be a problem for his company.

## CONCLUSIONS OF LAW

▮ The extraordinary remedy of a preliminary injunction may only be granted if the moving party demonstrates (1) that it is threatened with irreparable harm; (2) that this harm outweighs any injury which granting the injunction will inflict on other parties; (3) that the movant will probably succeed on the merits; and (4) that the public interest favors an injunction. *Data-*

*phase Sys., Inc. v. CL Systems, Inc.,* 640 F.2d 109, 113 (8th Cir.1981) (*en banc*). The issue of irreparable harm is a threshold issue; without a finding of irreparable harm, a preliminary injunction cannot be granted. *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.,* 871 F.2d 734, 738 (8th Cir.1989) (en banc). A showing of interference with the exercise of Constitutional rights will support a finding of irreparable injury. *Planned Parenthood v. Citizens for Community Action,* 558 F.2d 861, 867 (8th Cir.1977) (*citing* 11 C. Wright and A. Miller, *Federal Practice and Procedure* § 2948 at 440 (1973)).

▮ With those principles in mind, the Court first finds that plaintiffs have not shown any irreparable harm. The parties have entered into a stipulation to the effect that plaintiffs will not rely on economic harm as a component of the irreparable harm requirement (See Exhibit 83). Plaintiffs rely solely on an alleged constitutional deprivation to constitute irreparable harm. For reasons discussed below, the Court finds no constitutional damage.

Although the issue of irreparable harm is dispositive, the Court will proceed to discuss the other *Dataphase* factors. With respect to the balance of equities, the Court finds defendants have shown that they will suffer considerable harm to their reputations if the injunction is granted. Thus the harm that the defendants will suffer is at least equal to any harm, economic or otherwise, that plaintiffs will suffer. In view of plaintiffs' stipulation that economic harm is not to be considered, the balance of the equities tips in favor of defendants.

The factor of probable success on the merits warrants discussion of several issues. Plaintiffs' complaint contains three claims for relief: violation of the Communications Act of 1934, 47 U.S.C. § 201; viola-

---

**6.** At oral argument, counsel for plaintiffs suggested the he suspected that the state public utility commissions had traded a "favor for a favor" to bring about the auto-dialer policy at US West. He conceded that there is no evidence of such a fact but suggested that further discovery might uncover some. This Court will not engage in such speculation. The Court

notes that plaintiffs' complaint for injunctive relief was filed on August 29, 1989. The hearing on the motion was continued several times by stipulation of the parties pending further discovery. Numerous depositions have been taken. It thus appears that the plaintiffs have had ample time to discover such evidence, if it exists.

tions of constitutional rights under 42 U.S.C. § 1983; and violations of state law. Defendants assert that this Court lacks subject matter jurisdiction over the first claim for the reason that plaintiffs are specifically exempted from coverage under the Communications Act since the communications at issue are wholly intrastate. *See* 47 U.S.C. § 221(b).[7] Defendants also assert that, if the Communications Act is applicable, that plaintiffs have failed to exhaust their administrative remedies.

There is some factual dispute about whether the communications at issue are wholly intrastate. Ms. Sanko testified that it is not possible for calls to be made to other states on 976 lines. Mr. Abraham, on the other hand, stated that his telephones located in Des Moines, Iowa, called telephones located in Minnesota via a call-forwarding device.

The calls made in the Omaha–Council Bluffs metropolitan area are specifically exempted from coverage under the Act as intra-LATA calls. 47 U.S.C. § 221(b); *Puerto Rico Tel. Co. v. F.C.C.*, 553 F.2d 694 (1st Cir.1977) ("Section 221(b) was intended to exempt from FCC regulation 'exchange services in metropolitan areas overlapping state lines'"). Thus, those calls alone would not be enough to confer Federal jurisdiction. However, a great many, perhaps the majority of telephone facilities, practices, and regulations affect both intrastate and interstate messages. *Id.* at 699. FCC jurisdiction over § 201 extends to an interstate wire communication "from its inception to its completion." *Id.* Section 205(b) permits the FCC to regulate matters "for and in connection with [interstate] communications service" and section 152(b)

"excludes from federal jurisdiction matters for or in connection with intrastate communication service." *Id.*

It is clear that the contractual clause at issue deals only with "976" service. However, the evidence presented to the Court is not fully developed with respect to the issue of whether the eventual forwarding of a call outside state boundaries is enough to trigger the coverage of the Communications Act. The issue has not been briefed by the parties and is not properly before the court. Accordingly, the Court will defer ruling on the jurisdictional issue at this time.

Let it suffice at this stage to find that plaintiffs have not borne their burden of proving success on the merits of either the applicability of the Communications Act or their substantive claim under the Communications Act. Plaintiffs allege that the acts of defendants violate 47 U.S.C. § 201, which prohibits unjust or unreasonable charges or practices.[8] Plaintiffs couch their claim in terms of a discriminatory failure to provide billing management services. The principle of non-discrimination does not preclude distinctions based on reasonable business classifications. *Carlin Communications v. Mountain States Tel. and Tel. Co.*, 827 F.2d 1291, 1293 (9th Cir.1987).

Defendants have shown that the policy at issue is such a distinction. The challenged policy is not directed arbitrarily at plaintiffs but applies consistently to all information providers using auto-dialers. There has been no showing that these plaintiffs have been singled out for adverse

7. That statute provides:
(b) Subject to the provisions of Section 301 of this title, nothing in this chapter shall be construed to apply, or to give the Commission jurisdiction, with respect to charges, classifications, practices, services, facilities, or regulations for or in connection with wire, mobile, or point-to-point radio telephone exchange service, or any combination thereof, even though a portion of such exchange service constitutes interstate or foreign communication, in any case where such matters are subject to regulation by a state commission or by local governmental authority.

8. It is clear that the Federal Communications Commission (FCC) has primary jurisdiction over this claim. *See e.g., In re Long Distance Telecommunications Litigation*, 831 F.2d 627, 629–31 (6th Cir.1987). The doctrine of primary jurisdiction comes into play when, although the claim is originally cognizable in the courts, enforcement of the claim requires resolution of issues which have been placed within the special competence of an administrative body under the regulatory scheme. *Id.* at 630. This issue has not been addressed by the parties and the Court will not consider it at this time.

treatment. *See id.* at 1294. Also, defendants have shown that they have a considerable interest in protecting their reputations. *See id.* Last, the Court finds that public policy favors defendants' position. *See id.* The evidence shows that defendants permissibly exercised their business judgment.

█ With respect to plaintiffs' constitutional claim, the Court finds that plaintiff has not shown probability of success on the merits. In order to bring an action under 42 U.S.C. § 1983, plaintiff must show: (1) that the conduct complained of was committed by a person acting under color of state law and (2) that the conduct deprived the person of rights, privileges or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981).

█ The mere fact that a business is subject to extensive state regulation does not in and of itself convert its action into that of the state for purposes of the fourteenth amendment. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). *See also, Occhino v. Northwestern Bell Telephone Co.,* 675 F.2d 220 (8th Cir.), *cert. denied,* 457 U.S. 1139, 102 S.Ct. 2971, 73 L.Ed.2d 1358 (1982). Mere approval of or acquiescence in the initiatives of a private party is not sufficient to establish state action; a state can normally be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice in law must be deemed to be that of the state. *Carlin Communications, Inc. v. Southern Bell,* 802 F.2d 1352, 1357 (11th Cir.1986). Thus an action by a public utility can constitute state action when there is an impermissible exercise of coercive power. *Compare Carlin Communications v. Mountain States Tel. & Tel. Co.,* 827 F.2d 1291 (9th Cir.1987), *cert.*

*denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988) (threats by a county attorney to prosecute the telephone company if it did not terminate 976 service to an "adult entertainment" provider converted actions of phone company to state action) *with Occhino,* 675 F.2d at 225 (termination of a customer's service for making abusive calls, without any particularized state participation, did not constitute state action).

The Court finds no evidence of such impermissible coercive power by a state in this case. Ms. Sanko testified that she was responsible for the decision to terminate 976 service to companies using auto-dialers for advertising. She also testified that her decision was based only on business considerations and not on any pressure from governmental entities. In the absence of any credible or substantiated evidence to the contrary, the Court fully credits her testimony.

A factor of importance in the Court's decision is that the provision of billing services is not a traditional state function, much less one exclusively reserved for the state. A private business is "free to choose the content of messages with which its name and reputation will be associated and such a choice is not the exercise of a public function." *Id.* at 1361. The Court notes that the telephone companies have not denied plaintiffs access to their telephone lines, a function over which the phone companies exercise a monopoly. They are merely restricting the billing options of the plaintiffs.

Even if state action were present in this case, plaintiff has not shown probable success on the merits of the second essential element of an action under § 1983, that is, the deprivation of a constitutional right. Plaintiffs claim that first amendment rights have been infringed.[9]

█ The Court finds that this action

---

9. Plaintiffs also allude in their brief to deprivation of procedural due process rights. There has been no showing that plaintiffs have any property interest in the provision of billing management services (as opposed to an interest in access to transport) so as to trigger due process protections. Property interests do not arise whenever an individual has an abstract need or desire for or unilateral expectation of a benefit. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

principally involves commercial speech,[10] which is subject to less protection than other forms of speech. *See e.g., Board of Trustees of the State Univ. of New York v. Fox,* 109 S.Ct. at 3033. Government restrictions on commercial speech require something short of a least-restrictive-means standard. *Id.* This standard requires a fit between the state's ends and the means chosen to accomplish those ends. *Id.* at 3035. The fit need not be perfect but must be reasonable. *Id.* It need not represent the single best disposition, but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means, but a means narrowly tailored to achieve the desired objective. *Id.* at 3033.

With those standards in mind, the Court finds that there has been no infringement of first amendment rights. As noted, defendants are not denying these plaintiffs access to telephone lines. They can continue to use auto-dialers on 960 service and are free to spread their messages. Plaintiffs' right to free speech has simply not been infringed.

Plaintiffs have similarly not proven success on the merits of their state law claim. Plaintiffs' state law claim is based on alleged violation of Neb.Rev.Stats. § 75–126 and Art. X, § 7 of the Nebraska Constitution. Exclusive power to inquire into allegations or complaints involving unjust discrimination in the charging of rates is vested in the Public Service Commission. *Myers v. Blair Tel. Co.,* 194 Neb. 55, 60, 230 N.W.2d 190, 195 (1975). Even if the claim were properly before this Court, plaintiffs have not proven probable success on their non-discrimination claim for the

reasons set in the discussion of plaintiffs' Federal Communications Act claim.

Last, the Court considers the *Dataphase* factor of the public interest. Plaintiffs have not convinced the Court that the public interest favors granting the injunction. The record shows that the use of auto-dialers gave rise to numerous customer complaints. Plaintiffs concede that it will be difficult for them to collect their charges without the help of the phone companies, which evidences some consumer dissatisfaction with the services they provide. The phone companies, on the other hand, have shown that the public interest favors their position. The public can continue to recieve messages from information providers using 960 service.

Accordingly, plaintiffs' motion for preliminary injunctive relief will be denied. An order in conformity with this memorandum opinion shall issue this date.

---

**10.** Plaintiffs engaged in one joint charitable venture for the benefit of the homeless. The facts that this venture occurred only after the inception of this lawsuit, that it is the only joint project ever undertaken by plaintiffs who are admitted competitors, and that there is no evidence other than the plaintiffs self-serving testimony that charitable ventures had ever been contemplated prior to the inception of this lawsuit make the project suspect. At any rate, the Court is satisfied that plaintiffs' primary motive is "to propose a commercial transaction", which is the test for identifying commercial speech. *Board of Trustees of the State Univ. of New York*

*v. Fox,* —— U.S. ——, 109 S.Ct. 3028, 3031, 106 L.Ed.2d 388 (1989). Although charitable or fund-raising speech is afforded full first amendment protection, *id.,* the commercial speech at issue here is not inextricably intertwined with fully protected charitable fund-raising speech. Nothing prevents plaintiffs from conveying, or the audience from receiving, the non-commercial messages; plaintiffs remain fully able to conduct fund-raising activities on 960 lines. Nothing requires the non-commercial messages to be combined with commercial messages. *See id.*