**CARLIN COMMUNICATION, INC., etc., et al., Plaintiff-Appellant,**

v.

**SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, etc., et al., Defendants-Appellees.**

No. 85–5956.

United States Court of Appeals, Eleventh Circuit.

Oct. 23, 1986.

Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

Myles J. Tralins, Miami, Fla., Abelman, Frayne, Rezac & Schwab, Norman S. Beier, New York City, for plaintiff-appellant.

Phillip Newcomm, Shutts & Bowen, M. Therese Vento, Maxine M. Long, Miami, Fla., for Southern Bell.

David E. Smith, Florida Public Service Com'n, John Roger Howe, William S. Bilenky, Tallahassee, Fla., for Florida Public Service Com'n.

Before FAY and JOHNSON, Circuit Judges, and HOFFMAN *, Senior District Judge.

## CORRECTED OPINION

JOHNSON, Circuit Judge:

Appellant, Carlin Communication, Inc. ("Carlin"), appeals the grant of a motion for summary judgment in favor of appellees Southern Bell Telephone and Telegraph Company ("Southern Bell") and Florida Public Service Commission ("PSC"). We affirm.

---

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

## I. BACKGROUND

Southern Bell filed an amendment to its Florida General Subscriber Service Tariff with the PSC on November 14, 1983, proposing to offer a new service in its North Dade County and Jacksonville exchanges known as Local Dial-It Service. Dial-It is an announcement service provided by local telephone companies that allows telephone customers to call a specified number and receive a prerecorded message supplied by a subscriber to the service. The telephone company bills the customer for the call at a rate set by the subscriber. The telephone company deducts flat rate and usage charges, and then forwards the rest of the collected billings to the subscriber. The FCC has classified Dial-It as an enhanced service that is not required to be made available on an equal access basis. *Computer & Communications Industry Ass'n v. FCC*, 693 F.2d 198, 205 (D.C.Cir.1982), *cert. denied sub nom. Louisiana Public Service Comm'n v. FCC*, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983).

Carlin is a New York corporation engaged in providing Dial-It messages throughout the United States. Among the types of messages provided by Carlin are sexually suggestive messages, which are commonly referred to as "Dial-a-Porn." Carlin recently has been involved in a number of lawsuits in various states in connection with attempts by telephone companies to discontinue Carlin's Dial-It service because of the content of Carlin's messages. One of these lawsuits involves appellee Southern Bell. *Carlin Communication, Inc. v. Southern Bell Telephone and Telegraph Company*, Civil No. C84–510 (N.D.Ga. March 21, 1984).

As originally filed, Southern Bell's proposed Dial-It tariff contained no restriction on message content, other than the requirement that the subscriber exclude "any matter, the dissemination of which is prohibited by law." At the beginning of the public hearing held with regard to the Dial-It pro-

posal, Mr. Varner, Southern Bell's District Manager for Rates and Tariffs, read a proposed amendment into the record that changed the message content provision from one excluding only illegal messages to one also excluding any message that "implicitly or explicitly invites, describes, simulates, excites, arouses, or otherwise refers to sexual conduct, or which contains sexual innuendo which arouses or attempts to arouse sexual desire." The purpose of this amendment was to divorce the standard for refusal to accept messages from the standard of legal obscenity. The Dial-It tariff, including the proposed amendment, was finally approved at a Commission agenda conference on July 3, 1984.

Carlin initially advised Southern Bell of its interest in obtaining Florida Dial-It service in January 1984. Carlin made formal application for Dial-It service on August 10, 1984. After review of the three transcripts Carlin proposed using on its Dial-It lines, Southern Bell notified Carlin that it would not be able to provide service for two of the transcripts because they did not conform to its tariff provision.

On October 5, 1984, Carlin filed a Section 1983 action, 42 U.S.C.A. § 1983, against Southern Bell and the PSC alleging violation of the First and Fourteenth Amendments through prior restraint of free speech without constitutionally required procedural safeguards. Carlin sought (1) a declaratory judgment that the failure to activate Carlin's numbers was unconstitutional prior restraint of free speech and that Southern Bell's tariff was unconstitutional to the extent it permitted termination of service based solely on message content; (2) an injunction requiring Southern Bell to activate Carlin's Dial-It numbers and enjoining Southern Bell and the PSC from interfering with Carlin's Dial-It service because of message content without first complying with the procedural requirements for prior censorship; and (3) damages in excess of $1,000,000 from Southern Bell for failure to activate Carlin's Dial-It numbers.

Carlin was denied a preliminary injunction, and that decision was upheld on appeal by this Court. *Carlin Communication, Inc. v. Southern Bell Telephone and Telegraph Company*, 755 F.2d 174 (11th Cir.1985). The district court bifurcated the proceedings to consider the issue of state action first. Southern Bell and the PSC filed motions for summary judgment on this issue July 8 and 9, 1985. Sapphire Communications of Florida, Inc., a Carlin affiliate, was added by stipulation as a necessary party on July 10, 1985. The district court granted appellees' motions for summary judgment on October 5, 1985, and this appeal followed.

## II. DISCUSSION

### A. Subject Matter Jurisdiction

As a threshold consideration, we must determine if the district court lacked subject matter jurisdiction over this dispute under the Johnson Act, 28 U.S.C.A. § 1342. The Johnson Act provides that:

The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

(2) The order does not interfere with interstate commerce; and,

(3) The order has been made after reasonable notice and hearing; and,

(4) A plain, speedy and efficient remedy may be had in the courts of such State.

Although the Johnson Act explicitly applies only to injunctive relief, it has been judicially extended to bar declaratory judgment and damage actions as well. *Tennyson v. Gas Service Co.*, 506 F.2d 1135, 1139 (10th Cir.1974).

■ We find that the Johnson Act did not prevent the district court's exercise of

jurisdiction in this case. Although the Johnson Act has been broadly construed to prohibit federal court actions that indirectly as well as directly affect rate orders, *e.g., Tennyson*, 506 F.2d at 1139; *DeKalb County v. Southern Bell Telephone and Telegraph Co.*, 358 F.Supp. 498, 504 (N.D. Ga.1972), *aff'd*, 478 F.2d 700 (5th Cir.1973), the Act does not apply when the action is not in any manner a challenge to the rates charged by the regulated industry. *E.g., Alabama Public Service Comm'n v. Southern Railway Co.*, 341 U.S. 341, 350, 71 S.Ct. 762, 768, 95 L.Ed. 1002 (1951) (Johnson Act not applicable to challenge to order refusing to allow discontinuance of train service); *Cody v. Union Electric Co.*, 545 F.2d 610, 611–12 (8th Cir.1976) (Johnson Act not applicable to challenge to discriminatory credit policies regarding security deposits, when security deposits not considered part of rate structure); *Island Airlines, Inc. v. C.A.B.*, 352 F.2d 735, 744 (9th Cir.1965) (Johnson Act not applicable when challenge was to airline's right to fly particular route, not the rates it charged).

■ Carlin is not challenging the Dial-It rate structure approved by the PSC: its challenge is directed exclusively toward the tariff provision allowing termination of service based solely on message content. The relief Carlin seeks, if granted, would not in any way affect the rates established by the PSC for Southern Bell's services. Therefore, Carlin's challenge is outside the scope of the Johnson Act, which has as its purpose prevention of federal court interference with the states' control over their public utility rates. *See Tennyson*, 506 F.2d at 1137.

## B. Grant of Summary Judgment

### 1. Standard of Review

■ The appellate court's review of the grant of a summary judgment motion is plenary, and is conducted utilizing the same legal standards as those used in the district court. *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir.1985). Summary judgment is appropriate if the moving party establishes that there is no genuine issue as to any material fact and he is entitled to a judgment as a matter of law. *Id.;* Fed.R.Civ.P. 56(c). Even when the parties agree on the basic facts, summary judgment is inappropriate if reasonable minds might differ on the inferences to be drawn from those facts. *Warrior Tombigbee Transportation Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983).

In determining whether the moving party has met his burden, the evidence and inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party, and all reasonable doubts are resolved in his favor. *Mercantile Bank*, 750 F.2d at 841. Further, the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied. *Warrior*, 695 F.2d at 1299. Similarly, in deciding whether an inference is reasonable, the court does not compare that inference to others that might be drawn from the facts, but rather must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness, casting aside those which do not meet it and focusing solely on those which do." *Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485, 493 (5th Cir. Unit B 1982). The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. *Id.* at 495. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one. *Id.*

In the present case, the district court's grant of summary judgment was based on its determination that there was no genuine issue of material fact with regard to the existence of state action. Carlin urges that the record supports the reasonable inference that Southern Bell's decision to modify the language of the tariff proposal to exclude sexually suggestive material was motivated by the PSC, and that, therefore,

the district court's grant of summary judgment in this case represents an impermissible weighing of the conflicting inferences to be drawn from the evidence. We have reviewed the record and cannot agree.

2. Requirements to Establish State Action [1]

It is axiomatic that the Fourteenth Amendment only protects against deprivations of Constitutional rights by the state, not through private conduct, however discriminatory or wrongful. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349, 95 S.Ct. 449, 452, 42 L.Ed.2d 477 (1974). Therefore, the mere fact Southern Bell's conduct in excluding Carlin from access to Dial-It service might in the context of state action constitute impermissible prior restraint does not of itself make that conduct unconstitutional. Carlin must show that Southern Bell's actions are "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982).

■ The United States Supreme Court has utilized a number of different "tests" for state action in its cases, all of which the Court recently suggested may be "simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation." *Id.* at 939, 102 S.Ct. at 2755. Although expressed in terms of these various tests, the Court has indicated that the import of its holdings is that mere approval of, or acquiescence in, the initiatives of a private party is not sufficient to establish state action: "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v.*

*Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982).

■ The Supreme Court's decisions also have made it clear that in order to establish state action the plaintiff must show that the state is responsible for the specific conduct of which he complains. *Id.* "Faithful adherence to the state action requirement of the Fourteenth Amendment requires careful attention to the gravamen of the plaintiff's complaint." *Id.* at 1003, 102 S.Ct. at 2785. Review of Carlin's complaint shows that it is challenging both the specific decision by Southern Bell to deny access for two of its transcripts and the tariff itself, to the extent the tariff permits denial of access solely on the basis of message content. We must examine the record with regard to each of these claims to determine if a genuine issue of material fact as to state action exists.

Carlin has failed to point to anything in the record that would indicate the PSC was responsible for Southern Bell's decision to deny access to two of Carlin's transcripts and our review of the record indicates that no evidence of PSC involvement in this decision exists. Although there are references to "High Society" [2] type messages in discussions between Southern Bell and the PSC, there is nothing to indicate that the PSC was involved in Southern Bell's determination that the individual messages that it reviewed and turned down were messages of the type that its tariff sought to prohibit. The only reasonable inference that can be drawn from the record is that the decision to deny Carlin access for these transcripts was a judgment made by Southern Bell on the basis of its own private corporate standards. *Cf. Blum*, 457 U.S. at 1008, 102 S.Ct. at 2787 (although state regulations required evaluation of Medicaid

---

**1.** If challenged conduct constitutes state action for purposes of the Fourteenth Amendment, then that conduct also satisfies the 42 U.S.C.A. § 1983 requirement of action under color of state law. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935, 102 S.Ct. 2744, 2752, 73 L.Ed.2d 482 (1981). Therefore, although our analysis is framed in terms of state action, our conclusions are equally determinative of whether Carlin has

created a genuine issue of material fact on the issue of deprivation under color of state law for purposes of maintaining a Section 1983 action.

**2.** High Society magazine is an adult magazine to which reference sometimes is made in Carlin's sexually suggestive messages.

patients to determine if they were at the appropriate level of care, individual decisions to transfer challenged by plaintiffs were medical judgments made by private parties according to professional standards not established by the state); *Rendell-Baker v. Kohn,* 457 U.S. 830, 841, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418 (1982) (although private school was subject to extensive regulation, decisions to discharge teachers were not compelled or influenced by any state regulation).[3]

With regard to the tariff provision itself, our analysis must start with the special nature of Southern Bell as a privately-owned public utility. In *Jackson,* the Supreme Court held that when the private actor is a public utility the plaintiff must show that there is "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." 419 U.S. at 351, 95 S.Ct. at 453. Further, because utilities are required to seek approval for many practices that a less regulated business would be free to institute without approval, the mere fact that the practice complained of is authorized by regulation is insufficient to establish state action unless the regulating authority has "put its own weight on the side of the proposed practice by ordering it." *Id.* at 357, 95 S.Ct. at 456.

■ Carlin essentially makes four arguments to support its position that a genuine issue of material fact exists as to whether the requisite nexus is present with regard to placing the language prohibiting sexually suggestive messages into the Dial-It tariff. First, Carlin attempts to distinguish *Jackson* from the present case by arguing that the PSC's action in scheduling the tariff for further study and public hearing, and in issuing an order strongly approving of the tariff language, placed the "imprimatur" of the State upon that language.

In support of this argument, Carlin relies on the Supreme Court case of *Public Utilities Commission v. Pollak,* 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952). In finding that the requisite nexus was not present in *Jackson,* the Court contrasted the fact that the tariff provision in that case had "never been the subject of a hearing or other scrutiny by the Commission", with the practice at issue in *Pollak,* where the regulatory authority had commenced an investigation of the effects of the practice on its own motion and, after a full hearing, had concluded not only that the practice was acceptable, but that it was beneficial. *Jackson,* 419 U.S. at 354, 356–57, 95 S.Ct. at 455, 456–57. The *Jackson* Court indicated that commission activity such as that present in *Pollak* places the "imprimatur" of the state upon the regulation. 419 U.S. at 356–57, 95 S.Ct. at 456–57.

Carlin's reliance on *Pollak* is misplaced. In *Pollak,* the practice at issue, radio programs aboard city buses, already had been implemented. The regulatory agency in that case affirmatively undertook to study the practice after customers had complained and thereby took the initiative in determining the suitability of the practice. *Pollak,* 343 U.S. at 462, 72 S.Ct. at 820. In the present case, the PSC's action in undertaking further study of the Dial-It proposal was merely a response to the filing of the proposed tariff as part of its standard procedures for tariff approval and not an independent initiative on its part. There is uncontroverted evidence in the record that the PSC staff routinely sends proposed tariff amendments that the staff recommends should be denied, or that contain new or potentially controversial proposals of which the Commission should be aware, to the Commission for consideration at an agenda conference. The Dial-It tariff was put before the PSC with a staff recommendation

---

**3.** The PSC order approving the tariff clearly indicates that there was no intention on the part of the PSC to be involved in Southern Bell's decisions regarding message content: "we will expect *the Company* to make a determination as to [the] acceptability [of Dial-It messages] under

its tariff provisions *and the corporate standards of Southern Bell embodied therein."* (emphasis added). This language clearly leaves Southern Bell free to determine for itself what violates its tariff provisions.

that it be denied for reasons unrelated to message content. The PSC decided to reject the staff recommendation and suspend the automatic approval of the tariff for further study. The fact the PSC chose to study a proposal for a type of service never before offered in Florida and which under its procedures it must either reject out of hand, study further, or approve does not indicate action that would place the "imprimatur" of the state on the tariff language finally approved. The PSC's actions regarding the Dial-It tariff simply are not comparable to those of the regulatory authority in *Pollak.*

Second, Carlin argues that the tariff amendment as originally proposed at the beginning of the public hearing was intended to apply only to messages that were both sexually explicit *and* illegal and that pressure from the PSC during the public hearing led Southern Bell to alter the language during the course of that hearing to allow exclusion of sexually suggestive material without regard to its legality. Carlin points to an "and" scratched out in the draft of the amendment from which Varner read at the hearing and a statement during the hearing by Mr. Carbonnel, Southern Bell's attorney, that this language was intended to be in the conjunctive. This version of events, however, is not reasonably inferable from the facts. The official public hearing transcript shows that the "and" was omitted when Varner initially read the proposed language and the context in which Carbonnel made his statement shows that what he meant to say was "disjunctive." Further, we note that Carlin's version of events would mean that Southern Bell had proposed language that would leave it without any provision in its tariff that would prohibit other types of illegal messages, such as those violating gambling statutes.

Third, Carlin points to certain statements made by members of the PSC, and, in particular, by Commissioner Cresse, in support of its position that a genuine issue of material fact exists as to whether the PSC coerced Southern Bell into amending

its tariff language. These statements show that Commissioner Cresse, who was assigned as pre-hearing officer with regard to the Dial-It tariff, was concerned about the issue of content control over Dial-It messages. They show that he expressed this concern at the original agenda conference in the context of asking whether "High Society magazine" could sell "pornographic phone calls" and at the prehearing conference by indicating that the message content issue was one that should be considered at the public hearing, despite advice of the PSC's attorney that the issue was one that he believed should be avoided and Southern Bell's concern about being placed "in the position of determining what is unlawful in terms of pornography."

Commissioner Cresse's comments, however, when read in the context of the agenda conference and prehearing conference transcripts as a whole, do not support an inference that the PSC required Southern Bell to add a prohibition on message content such as that subsequently proposed. Viewing these comments in the light most favorable to Carlin, they show that the PSC, and particularly Commissioner Cresse, felt that message content was one of many issues that should be studied before a decision was made on the Dial-It tariff and one that should be considered at the public hearing. This falls far short of coercive activity designed to pressure Southern Bell into amending its tariff to contain the broad language regarding message content that ultimately was proposed.

Carlin also points to certain comments made by Commissioner Cresse and Chairman Gunter during the public hearing after the amendment was proposed and at the final agenda conference during which the tariff was approved as creating an inference that Southern Bell was coerced into placing this language in the tariff. The transcript of the public hearing shows that the PSC understood the amendment offered at the beginning of the hearing to be aimed at "High Society" type messages and that it was aware of the problems that Southern Bell and other telephone compa-

nies had experienced in trying to discontinue Carlin's service because of message content. The Commission also expressed strong approval of the proposed amendment, although Chairman Gunter questioned whether such a provision would be enforceable. Both Commissioner Cresse and Chairman Gunter expressed the opinion that if the tariff language was not enforceable then the PSC should reconsider allowing Dial-It service in Florida. The PSC, and, in particular, Commissioner Cresse, also probed the method by which Southern Bell would review messages presented for the Dial-It service and indicated that, while review was voluntary, they expected that review would take place. Similar sentiments are incorporated in the order approving the tariff. Carlin argues these comments, when viewed in light of the considerable revenues that would be generated by the Dial-It service, create a reasonable inference of coercion.

Initially it must be noted that the comments to which Carlin refers were made after the language about which it complains already had been proposed. Carlin argues that the timing of these statements is not significant because the tariff was not finally approved until the final agenda conference, and attempts to create an inference that Southern Bell was reluctant to change the tariff language from the fact the amended tariff was not sent to the PSC until after final approval. The mere fact that Southern Bell waited until it was sure the tariff would be approved as proposed before sending it, however, cannot of itself create an inference of reluctance on Southern Bell's part, and Carlin points to nothing else that would support a reasonable inference that Southern Bell had any desire to withdraw the proposed language or to further modify it between the time of the public hearing and the final agenda conference. Therefore, while we do not view the commissioner's comments as totally irrelevant, their timing makes them significantly less probative on the issue of coercion.

▆ Further, in order to create a genuine issue of material fact, an inference must be reasonable viewing the record as a whole, and the record in this case contains uncontroverted evidence that the proposed amendment came about as the result of a directive from Walter H. Alford, Southern Bell's chief executive officer for Florida operations, who wanted tariff language inserted that would divorce the message content requirement from the legal definition of obscenity as an attempt to avoid problems similar to those encountered by Southern Bell in attempting to discontinue Carlin's Dial-It service in Georgia. This evidence shows that Southern Bell was motivated by a desire to protect its own corporate image through language that would give it the freedom to deny access to messages with which it did not wish to be associated on an across the board basis, rather than being tied to the community standard of each community that it serviced. Although a court should be wary of placing too much reliance on the testimony of the movant regarding facts in its exclusive knowledge in granting a motion for summary judgment, the evidence of motive offered by the PSC and Southern Bell is entirely consistent with the other evidence in the record, including the statements made by members of the PSC, and Carlin has pointed to nothing in the record that creates a genuine issue as to its credibility. *Cf. Wilmington Trust Co. v. Manufacturers Life Ins. Co.,* 624 F.2d 707, 709, *reh. denied,* 632 F.2d 895 (5th Cir.1980) (possibility of impeachment sufficient to create genuine issue of material fact with regard to evidence in exclusive knowledge of movant who bears burden of persuasion). Viewing the record as a whole and in the light most favorable to Carlin, the statements to which it points show strong approval by the PSC of review of proposed Dial-It messages pursuant to the proposed amendment, and an opinion on the part of at least two members of the PSC that, if the amendment were not effective in restricting access to Dial-It by "High Society" type messages, approval of the Dial-It service should be reconsidered. These statements, however, under the circumstances of this case, do not give rise to a

reasonable inference that the PSC coerced Southern Bell into placing the proposed language in its tariff in the first place. As noted above, the mere approval by the PSC of a business practice of the regulated utility does not "transmute a practice initiated by the utility" into state action. *Jackson,* 419 U.S. at 345, 95 S.Ct. at 449; *accord, Blum,* 457 U.S. at 1004–05, 102 S.Ct. at 2785–86.

▮ Finally, Carlin argues that state action is present because the PSC has delegated the public function of censorship to Southern Bell. The required nexus between the state and a private actor may be present if the private entity has exercised powers that are "traditionally the exclusive prerogative of the State." *Blum,* 457 U.S. at 1005, 102 S.Ct. at 2786, *quoting, Jackson,* 419 U.S. at 353, 95 S.Ct. at 454. We do not find, however, that a genuine issue of material fact as to delegation of a public function is present in this case.

First, Carlin has pointed to nothing in the record to indicate that the purpose of the restriction was "public" censorship. The evidence in the record indicates that Southern Bell was motivated by a desire to protect its own corporate image and avoid problems similar to those it encountered with Carlin in Georgia.

Second, the operative word in the public function test is "exclusivity." As the Supreme Court noted in *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), while many functions traditionally have been performed by governments, very few have been exclusively reserved to the state. *Id.* at 159, 98

S.Ct. at 1735. We are not convinced that restriction of message content is such a function exclusively reserved to the state. While "public" censorship may be a function traditionally performed by the state, it is clear that restriction of message content by a private company based on a determination that it does not wish to do business with another company is not a traditional state function, much less one exclusively reserved to the state.[4] A private business is free to choose the content of messages with which its name and reputation will be associated and such a choice is not the exercise of a public function. As the Supreme Court has noted, careful adherence to the state action requirement "preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." *Lugar,* 457 U.S. at 936, 102 S.Ct. at 2753. There is no indication from the record that the tariff provision authorized Southern Bell to do anything that it could not have done as a private business.[5] *Cf. Flagg Brothers, Inc.,* 436 U.S. at 162 n. 12, 98 S.Ct. at 1736 n. 12 (state statute only authorized what defendant would tend to do in absence of authorization and was not a significant departure from traditional private arrangements.)

### III. CONCLUSION

Summary judgment was properly granted. The only reasonable inference that can be drawn from the record in this case is that the operative decisions, both as to inclusion of the language in the tariff and as to the refusal to activate Carlin's Dial-It service, were made by Southern Bell and not the PSC and, therefore, the actions of

---

**4.** We note that one court has found state action in connection with termination of Carlin's service based on message content under the public function test. *Carlin Communications, Inc. v. South Central Bell Telephone Co.,* 461 So.2d 1208, 1212 (La.App.1984). As our discussion above indicates, we do not find the reasoning of the Louisiana court persuasive. Further, we also would note that the tariff provision involved in that case was different from the one at issue in the present case, giving as its reason for prohibiting sexually explicit material the desire to control access to such messages "by the general public, including minors." *Id.* at 1212.

The Louisiana court found that the protection of minors from exposure to obscenity is ordinarily a state concern. *Id.* No similar purpose is given for the restriction in the Southern Bell tariff.

**5.** We would stress in this context that Dial-It service is not part of Southern Bell's function as a common carrier and therefore is not subject to the requirements regarding equal access that apply to telecommunications services offered by Southern Bell as a common carrier. *See* 47 U.S.C.A. § 201 (1962).

which Carlin complains are not fairly attributable to the state. AFFIRMED.