**NETWORK COMMUNICATIONS, a Nevada Partnership, Plaintiff,**

v.

**MICHIGAN BELL TELEPHONE COMPANY, Defendant.**

Civ. No. 88–72365.

United States District Court, E.D. Michigan, S.D.

Jan. 18, 1989.

---

Kael B. Kennedy, Kirk D. Messmer, Matkov, Salzman, Madoff & Gunn, Chicago, Ill., for plaintiff.

James K. Robinson, Jennifer J. Pereogord, Honigman, Miller, Schwartz and Cohn, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

In April, 1987, plaintiff Network Communications ("NetCom") and defendant Michigan Bell Telephone Company ("Michigan Bell" or "MBT") contracted for provision of access lines for plaintiff's recorded telephone message service, known as a Sponsored Program Services or SPS program, as well as for billing services for customer-dialed calls. The Billing Services Agreement, which became effective on April 1, 1987 (1987 BSA), provided that defendant Michigan Bell would bill and collect for NetCom from individual customers who made calls to NetCom's pre-recorded entertainment message, on telephone line # 1–976–3232.

Paragraph VIII of the April 1987 BSA, captioned "Termination," provided that Michigan Bell could terminate billing and collection for the plaintiff only under certain circumstances amounting to "cause", such as a failure to pay for the services provided.

On May 10, 1988, defendant sent a written Notice of Termination to plaintiff, indicating that defendant was terminating billing and collections services for calls made to plaintiff's SPS program. This cancellation was made pursuant to the termination provisions of a January 12, 1988 "Sponsored Program Services Billing Services Agreement" (1988 BSA), which defendant asserts superceded and replaced the 1987 BSA. Plaintiff's Exhibit C.

Approximately thirty (30) days later, on June 9, 1988, defendant did in fact cease billing and collecting for calls made to plaintiff's telephone service.

The parties dispute the effectiveness of the January 1988 BSA, and this dispute and related claims by the parties form the subject matter of plaintiff's first amended complaint. In the amended complaint, filed on June 15, 1988, plaintiff alleges that defendant's termination of billing and collecting services for plaintiff's recorded message program breached the April 1987 BSA and that the termination was also a violation of plaintiff's First Amendment-protected rights to free speech and expression.

Shortly after NetCom and Michigan Bell signed the first billings services agreement in April, 1987, they became entangled in a dispute involving a second, separate service by which NetCom provided callers to another phone line with live or interactive, rather than pre-recorded, messages.

The parties subsequently entered into settlement negotiations related to the interactive message service, culminating in the signing by both parties of three documents on January 12, 1988: (1) a "Settlement Agreement"; (2) a "Mutual Release and Settlement Agreement" (Mutual Release); and (3) a "Sponsored Program Services Billing Services Agreement" (the January, 1988 BSA). See defendant's Exhibits A, B, and C respectively.

For reasons discussed more fully below, defendant Michigan Bell maintains that the BSA signed on January 12, 1988 fully replaced the earlier April, 1987 BSA, while plaintiff NetCom argues that the January, 1988 BSA never became effective, and thus that the parties' billing termination rights continue to be governed by the 1987 BSA.

Among the significant revisions in the January 1988 BSA from the 1987 version was a change in the conditions for termination, eliminating the requirement of cause before billing service could be ended. The revised termination provision, ¶ 12 of the 1988 BSA, states:

> This Agreement may be terminated either in its entirety, or as to any sponsor program by either party without penalty for any reason upon thirty (30) days written notice.

Defendant asserts that ever since the Michigan Public Service Commission (MPSC) authorized Michigan Bell to provide SPS programs in November, 1985, defendant has received a growing number of complaints with regard to its provision of access lines to certain SPS sponsors whose recorded messages are considered to be sexually-explicit and/or obscene. Defendant asserts that plaintiff's recorded message service falls somewhere within this category, while plaintiff asserts that its recorded messages are neither obscene, nor otherwise offensive, but simply an entertainment service offered to those who choose to call its number.

According to Michigan Bell, while MPSC tariffs do permit sexually-explicit messages in SPS programs, those tariffs do not require defendant to provide billing services for such programs, but rather leave such decisions to be set as a matter of business policy by the telephone company. NetCom cites no MPSC tariffs provision to the contrary.

On February 4, 1988, approximately three weeks after the parties signed the Settlement Agreement, Mutual Release and 1988 BSA on January 12, 1988, defendant announced through a press release that it was adopting new "976/900 and Similar Service Guidelines", pursuant to which it would decline billing services for SPS programs which it found to be "objectionable." While it is not clear what defendant meant in using the term "objectionable," it is undisputed that after reviewing all 976 programs, letters were sent to six sponsored program vendors, including plaintiff, indicating that their billing services agreements would be terminated in 30 days.

Billing and collecting for NetCom's SPS line # 976–3232 was ended on June 9, 1988. At the time, defendant continued to provide billing services for plaintiff's other, interactive phone service, although plaintiff asserts that defendant has since disconnected both NetCom's live and prerecorded phone lines, on September 20, 1988, for failure to pay the June, 1988 bill for the recorded message service. For the reasons set forth in its amended complaint, plaintiff disputes the validity of the June, 1988 bill from defendant.

In contrast to defendant's position that the 1988 BSA permitted termination of billing services on 30 days' written notice, plaintiff maintains that the 1988 BSA never became effective because it was contingent upon MPSC approval of the Settlement Agreement also signed by the parties on January 12, 1988. Because the MPSC disapproved that Settlement Agreement on February 23, 1988, plaintiff argues that the January, 1988 BSA is also void, and that therefore, defendant's termination of billing services without "cause" was a breach of the April, 1987 BSA.

On June 15, 1988, the same date on which plaintiff filed its first amended complaint, plaintiff also filed a motion for preliminary injunction. After oral argument by the parties on July 11, 1988, the Court entered an Order denying the motion in all respects, but ordering that defendant Michigan Bell "shall retain billing data, including phone numbers and names, for callers of plaintiff's Sponsored Program Services number, 976–3232, pending trial of this matter."

Plaintiff subsequently filed an "Emergency Motion for Preliminary Injunction" on August 26, 1988, which was denied by the Court after oral argument on September 8, 1988. The Court specifically held that the Emergency Motion for Preliminary Injunction was merely a rehearing of the prior motion for preliminary injunction, and that as such, it was without merit. The Court noted that the defendant was complying with the Court's July 14, 1988 Order requiring defendant to retain billing data on calls made to plaintiff's SPS recorded program and that as plaintiff had failed to demonstrate any injury other than asserted monetary damages, injunctive relief was inappropriate.

On August 5, 1988, plaintiff filed its motion for summary judgment, and on September 7, 1988, defendant filed, as its response, a cross-motion for summary judgment. After oral argument the Court took the cross-motions under advisement, and this Memorandum Opinion and Order represents the findings of fact and conclusions of law made by the Court, based on the undisputed material facts in this record.[1]

In addition to seeking a preliminary injunction in Count I, plaintiff's first amended complaint alleges breach of the April 1, 1987 Billing Services Agreement (Count II); and a violation pursuant to 42 U.S.C. § 1983 of the free speech and association rights of plaintiff and its customers, as protected by the First and Fourteenth Amendments (Count III).[2]

After full consideration of the pleadings, affidavits, exhibits and oral argument of counsel, and basing its decision solely on the undisputed material facts in the record, the Court must grant summary judgment for defendant on both the alleged breach of contract and the claimed deprivation of protected free speech and association rights.

I

Defendant's decision to terminate billing and collection services for plaintiff's SPS recorded program was permissible under the terms of the January 12, 1988 Billing Services Agreement, which the Court finds to be a valid, enforceable contract, superceding and replacing the April, 1987 billing agreement.

---

**1.** While the Court's ruling on the cross-motions for summary judgment has been pending, two additional motions have been filed. First, on November 7, 1988, one week after oral argument on the cross-motions for summary judgment, plaintiff filed a motion for disqualification of the Court pursuant to 28 U.S.C. § 455, which was denied after oral argument on December 12, 1988.

In addition, on December 9, 1988, plaintiff filed a motion for leave to amend complaint. Oral argument has been set for February 13, 1989. No response to the motion for leave to amend complaint has been filed with the Court as of this date.

**2.** Plaintiff also alleges in Count IV of the first amended complaint that defendant's attempt to terminate the April 1, 1987 BSA is "discriminatory, unjust, anti-competitive and unreasonable, and violates Act 315 of the Public Acts of Michigan of 1986." However, because such charges are totally without supporting factual allegations, and are not addressed by either of the parties in their cross-motions for summary judgment, the Court must dismiss them as failing to state a cause of action under Rule 12(b).

Plaintiff's fundamental argument in support of its breach of contract claim is that the three documents signed by the parties on January 12, 1988 constitute a single, indivisible contract and that the validity and effectiveness of the January 1988 BSA was contingent on approval of the contemporaneously-signed Settlement Agreement by the MPSC.

Because the MPSC disapproved the proposed Settlement Agreement, plaintiff argues, the January 1988 BSA never became effective and did not supplant the earlier, April 1987 BSA limiting the right to terminate to situations involving cause only.

Plaintiff's argument, and therefore his claim, fails because it is unsupported by the clear and explicit language of any of the three documents signed on January 12, 1988, whether read independently or in conjunction, and because it is contrary to the undisputed dealings between the parties in this record.

The January, 1988 Billing Services Agreement is straightforward in its terms, and where the provisions of a contract are clear and unambiguous, the Michigan courts have held that the contract language must be construed according to its plain sense and meaning. *Commonwealth Bank v. Criminal Justice Institute*, 102 Mich.App 239, 244, 301 N.W.2d 486 (1980).

The critical provision of the January 1988 BSA for the issues before the Court is the termination provision, ¶ 12, which states in relevant part:

> This Agreement may be terminated either in its entirety, or as to any sponsor program by either party without penalty for any reason upon thirty (30) days written notice.

Of course, plaintiff's summary judgment motion makes clear that it does not dispute the meaning of the language in ¶ 12, or indeed, any of the express provisions of the January 1988 BSA. Rather, plaintiff's claim that the three documents signed on January 12, 1988 form a single, indivisible contract, *which did not become effective*, is based primarily on the language of *another* document signed on that date: the Mutual Release and Settlement Agreement (Mutual Release).

The critical provisions of the Mutual Release are ¶ 5 and ¶ 6, referring to the Settlement Agreement and the BSA respectively.

Paragraph 5 states:

> Contemporaneously with this Agreement, the parties and all intervenors in U–8832, shall execute a Settlement Agreement in U–8832, an unexecuted copy of which is attached hereto as Exhibit "A". The parties understand and agree that it is a condition precedent to this Agreement that the Settlement Agreement be approved by, and the terms of the Settlement Agreement incorporated into, an order of the Michigan Public Service Commission.

This language clearly indicates the parties' intent that the effectiveness of the Mutual Release be dependent upon MPSC approval of the Settlement Agreement.

Paragraph 6 states:

> Contemporaneously with this Agreement, the parties shall enter into an Interactive Voice Service Billing Services Agreement and/or a Sponsored Program Services Billing Services Agreement, an unexecuted copy of which is attached hereto as Exhibit "B". Pending approval of the revised MBT [Michigan Bell] Community Information Services tariff attached to the Settlement Agreement in U–8832, the following fees contained in the Interactive Voice Services Billing Services Agreement and the Sponsored Program Services Billing Services Agreement shall be amended as follows:
>
> IV. BILLING SERVICES: The Billing fee for Option B shall be $.02 per billable call.
>
> V. COLLECTION SERVICES: The collection fee shall be waived.

The conditional language in ¶ 5 is *completely absent* from ¶ 6, which recognizes the implementation of the contemporaneously-executed BSA, with two modifications. Specifically, the phrase "condition precedent" in ¶ 5, expressly providing that MPSC approval of the Settlement Agreement is a *prerequisite* to the effectiveness

of the Mutual Release, does not appear in the corresponding paragraph referring to the 1988 BSA.

The absence of such conditional language in ¶ 6, referring to the BSA, is even more striking, given the immediate proximity of ¶¶ 5 and 6, and the obvious parallellism in their language.

While plaintiff is correct that all three agreements were signed by both parties on the same date, those similarities alone do not transform multiple agreements into a single, indivisible contract. Under Michigan law, the courts consider three principal factors in assessing the divisibility and validity of multiple agreements:

 1) Whether the terms of each agreement modify or alter terms of the others;

 2) Whether the terms of each agreement are definite and certain; and

 3) Whether each agreement is supported by independent consideration.

See *Shirey v. Camden,* 314 Mich. 128, 22 N.W.2d 98 (1946).

Applying these factors, it is clear under Michigan law that the January 1988 Billing Services Agreement is in fact a separate and divisible contract supported by independent consideration.

First, the 1988 BSA make no reference to the Settlement Agreement, nor does the Settlement Agreement refer *either* to the 1988 BSA *or* to the Mutual Release which plaintiff describes as the umbrella agreement which "tied the package together."

Second, only the Settlement Agreement was submitted for approval to the MPSC. Neither party here contends that they could not enter into or modify a billing services agreement independent of any action by the Public Service Commission.

Third, the critical phrase in ¶ 5 of the Mutual Release, "condition precedent to this Agreement," is definite and certain as to which "Agreement" is subject to the condition precedent. Both ¶ 5 and ¶ 6 begin with the phrase "contemporaneously with this Agreement ..."; ¶ 5 then links the Agreement to the Settlement Agreement, while ¶ 6 links it to the 1988 BSA. Thus, the "Agreement" linked in succes-

sive paragraphs to the Settlement Agreement and the 1988 BSA, by process of elimination, can only be the "Mutual Release and Settlement Agreement" between the parties. No other "Agreement" is cited.

Moreover, the terms set forth in the January, 1988 BSA spell out the entire billing services contract between the parties.

While it is true that ¶ 6 of the Mutual Release modifies two fee provisions in the contemporaneous BSA, the *specific reference* to the alteration of only two of the many provisions of the new BSA unmistakeably indicates the intention of the parties that the 1988 BSA would be effective upon its execution without additional approval.

Indeed, were the three documents all merely subparts of one indivisible contract, these two billing provisions would more likely and appropriately have been made part of the 1988 BSA itself, rather than the Mutual Release.

Finally, the 1988 Billing Services Agreement is supported by independent consideration. First, the terms of paragraph VIII of the 1988 BSA provided that defendant would not retain any portion of customer payments as reserves for uncollectibles for a period of six months (at the outset of the contract). It is undisputed that this provision differed from the parties' prior arrangements and that this alteration was decidedly beneficial to plaintiff.

It is similarly undisputed that in ¶ 7 of the Mutual Release, referring specifically to the contemporaneously-executed BSA, defendant accorded another benefit to NetCom reducing its potential out-of-pocket expenses during the first three months of the new Billing Services Agreement.

¶ 7 provides:

To the extent that actual uncollectibles of Information Provider exceed 25% of the total billed revenue during the first 90 days of the Billing Services Agreement entered into by the parties as set forth above, such excess uncollectibles may, at the option of the Information Provider be paid to Michigan Bell over a

period of six months with interest on the unpaid amount oat the rate of 12% per annum.

See Defendant's Exhibit B.

Not only does this provision clearly favor plaintiff, but the undisputed facts demonstrate that NetCom's president, Benjamin Greenspan, *specifically requested* that Michigan Bell implement this provision in April, 1988, when the total of excess uncollectibles for the first 90 days became known, and that Michigan Bell acceded to this request.

In a letter dated April 8, 1988, Greenspan requested that defendant "mak[e] the appropriate calculation to effect our arrangement on deferred payment of uncollectibles." See Defendant's Exhibit D.

William Champion III, an attorney employed by Michigan Bell, testified in an affidavit attached to defendant's summary judgment motion as Exhibit E, that upon Greenspan's April 8, 1988 letter, he telephoned Greenspan to confirm the request for deferred payment of excess uncollectibles, and such confirmation was received. According to Champion's affidavit, which is undisputed as to this matter, Michigan Bell then amortized NetCom's excess uncollectibles over a period of six months, pursuant to the terms of the 1988 Billing Services Agreement, as modified by ¶ 7 of the Mutual Release, resulting in the payment of an *additional* sum of nearly $20,000 "representing uncollectibles exceeding 25% of billings during the months of January through March, 1988."

Thus, on the undisputed facts of record, plaintiff received independent and adequate consideration for entering into a new billing services arrangement.

The Court need not go beyond the plain and unambiguous terms of the January 12th Billing Services Agreement, Mutual Release, and the Settlement Agreement, and the undisputed and compelling evidence of independent consideration, in finding that plaintiff has failed to demonstrate a material issue of fact regarding the effectiveness of the 1988 BSA.

Nonetheless, the undisputed evidence of the parties' actions *after* the Michigan Public Service Commission disapproved the Settlement Agreement on February 23, 1988 unequivocally confirms that the parties intended the January, 1988 BSA to continue to function as an independent contract—unaffected by the MPSC rejection of the Settlement Agreement.

The most compelling evidence of this intent is the April 8, 1988 letter from plaintiff's president, Benjamin Greenspan, to defendant's corporate attorney, William Champion, specifically requesting implementation of the provision of the 1988 BSA permitting deferred payment of excess uncollectibles. This letter was sent approximately six weeks *after* MPSC disapproval of the January 12 Settlement Agreement. If, as plaintiff now contends, its "understanding" was that MPSC approval of the Settlement Agreement invalidated the 1988 BSA as well, it would never have made this request of defendant. Moreover, defendant's prompt follow-up telephone call to confirm the contents of the April 8th letter, its confirmation by plaintiff, and defendant's subsequent act of paying nearly $20,-000 in *additional funds* to plaintiff pursuant to the excess uncollectibles provision confirm that it ws both parties' intent that the 1988 BSA would continue to operate with or without an MPSC-approved Settlement Agreement.

The parties' belief in the independent vitality of the 1988 BSA is further demonstrated by defendant's implementation of the 1988 BSA *with the two fee modifications* set forth in the Mutual Release, and the BSA's continued operation *as modified* until its termination on June 9, 1988.

Plaintiff has presented no affidavit or other evidence disputing the clear meaning of the April 8, 1988 letter from its president to Champion; nor has plaintiff offered evidence demonstrating that plaintiff ever objected to the implementation of the modified 1988 BSA *prior to* filing this lawsuit on June 7, 1988.

■ Under Michigan law, all contracts must be construed with the object of effecting the intent of the parties. *Piasecki v. Fidelity Corp. of Michigan*, 339 Mich. 328,

337, 63 N.W.2d 671 (1954); *Burland, Reiss, Murphy & Mosher, Inc. v. Schmidt*, 78 Mich.App 670, 674, 261 N.W.2d 540 (1977); *Central Jersey Dodge Truck Center, Inc. v. Sightseer Corp.*, 608 F.2d 1106 (6th Cir. 1979). Thus, even assuming an ambiguity in the contract language which has not been demonstrated, the Court concludes that the undisputed evidence of the parties' actions *subsequent to* disapproval of the Settlement Agreement confirm their jointly-held belief and intention that the 1988 BSA operate without regard to the fate of the Settlement Agreement.

Thus, summary judgment must be granted to defendant on plaintiff's breach of contract claim.

## II

■ The Court must also grant summary judgment for the defendant on plaintiff's First Amendment claims, for the reason that defendant's termination of billing and collection services for plaintiff's SPS recorded message program does not, on the undisputed facts and well-established law, constitute prohibited state action.

In any action brought pursuant to 42 U.S.C. § 1983, plaintiff's initial burden is to demonstrate that the alleged infringement of federal rights is either state action or action that may be "fairly attributable to the state." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982); *Rendell–Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982).

In *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 348, 95 S.Ct. 449, 452, 42 L.Ed.2d 477 (1974), the Supreme Court held that the fact that a privately-owned utility company operates as a monopoly under state law does not, in and of itself, transform all of the private utility's acts into "state action." In that case, the Supreme Court concluded that, despite its extensive regulation by the state public utility commission, the defendant's act of discontinuing service for nonpayment of bills was *not* state action. *Id.*, 419 U.S. at 358, 95 S.Ct. at 457.

Nor is the fact that the defendant has a close operating relationship with the state determinative of the "state action" question.

In *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the plaintiffs, employees of a private school, alleged that they had been discharged in retaliation for exercising First Amendment rights. The Supreme Court concluded that, despite the fact that the school received more than 90% of its funds from public sources and was heavily regulated by state and local authorities, its decision to terminate plaintiffs' employment did not constitute state action absent some proof that the termination decision was either compelled or influenced by state regulation or other act. *Id.*, 457 U.S. at 841–42, 102 S.Ct. at 2771–72.

More recently, the Sixth Circuit held in *Adams v. Vandemark*, 855 F.2d 312 (6th Cir.1988), that despite strong evidence of a "symbiotic relationship" between a non-profit corporation funded almost entirely from public sources and a Michigan city from which the corporation had leased office space for thirty years at a nominal rent, the non-profit corporation's decision to terminate the plaintiffs was not "state action" absent evidence that state regulation compelled or influenced the termination decision.

In the instant case, plaintiff NetCom asserts in Count III of its amended complaint that the Michigan Public Service Commission staff "has sought and obtained the agreement of Michigan Bell Telephone Company to act for them in effectively regulating and controlling the form and content of sponsored program services." Plaintiff charges defendant with acting as the "alter ego" or "surrogate" for the MPSC in carrying out an impermissible infringement of plaintiff's right to freedom of speech and its customers' right to freedom of association.

The amended complaint specifically claims that Michigan Bell's termination of billing and collection services constitutes an "unconstitutional prior restraint of speech" and that defendant "as a common

carrier" must transmit message without regard to their form or content.

Two recent decisions by federal appellate courts specifically address the distinction between prohibited state action and private business decisionmaking in the context of telephone company services and privately-sponsored programs such as NetCom's recorded message service.

In *Carlin Communications, Inc. v. Southern Bell*, 802 F.2d 1352 (11th Cir. 1986), a "Dial–It" or sponsored program subscriber (such as plaintiff here) was denied access to the local telephone company's exchange facilities to transmit recorded messages deemed to be sexually-explicit. Unlike the situation in the instant case, the defendant's decision was made pursuant to an applicable tariff provision *approved* by the State Public Service Commission.

In affirming the district court's grant of summary judgment to the defendant based on a finding of no state action, the Court of Appeals emphasized the distrinction between state action and private business decisions:

> [T]he mere fact that Southern Bell's conduct in excluding Carlin from access to Dial–It service might in the context of state action constitute impermissible prior restraint does not of itself make the conduct unconstitutional. Carlin must show that Southern Bell's actions are "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 [102 S.Ct. 2744, 2753, 73 L.Ed.2d 482] (1982)...
>
> [Mere] approval of, or acquiesence in, the initiatives of a private party is not sufficient to establish state action: "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State" *Blum v. Yaretsky*, 457 U.S. 991, 1004 [102 S.Ct. 2777, 2786, 73 L.Ed.2d 534] (1982).

802 F.2d at 1357.

In *Carlin Communications, Inc. v. Mountain States Telephone and Telegraph Co.*, 827 F.2d 1291 (9th Cir. 1987), *cert. denied,* — U.S. —, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988), the Ninth Circuit held that the initial termination of plaintiff's sexually-suggestive dial-a-message program did constitute state action solely because the termination was made at the request of a deputy county attorney threatening defendant with prosecution under Arizona criminal law. The Court found that such action amounted to an impermissible exercise of "coercive power" by the state. 827 F.2d at 1295. However, the court of appeals went on to hold, consistent with the Eleventh Circuit's decision in *Southern Bell*, that the *subsequent* termination of plaintiff's service under a new company policy excluding all "adult entertainment" from the 976 network did *not* constitute state action, but was a matter of private contract between the parties. *Id.* at 1297.

Thus, both the Ninth and Eleventh Circuits have held that telephone companies may adopt policies under which they decline to provide sponsored program services to information providers offering sexually-explicit messages, as a *matter of business discretion and judgment.*

> In *Southern Bell,* the Court concluded: While 'public' censorship may be a function traditionally performed by the state, it is clear that restriction of message content by a private company based on a determination that it does not wish to do business with another company is not a traditional state function, much less one exclusively reserved to the state. *A private business is free to choose the content of messages with which its name and reputation will be associated* and such a choice is not the exercise of a public function.

802 F.2d at 1361 (emphasis added).

Moreover, the *Southern Bell* court explicitly rejected the suggestion made here by plaintiff NetCom that Michigan Bell's function as a common carrier transformed its actions into state action:

> We would stress in this context, that Dial–It service is not part of Southern Bell's function as a common carrier, and

therefore is not subject to the requirements regarding equal access that apply to telecommunications services offered by Southern Bell as a common carrier. *Id.* at 1361 n. 5.

Applying these holdings to the instant case, it is clear that if a telephone company may refuse to provide *access* to information providers whose messages it does not wish to be associated with, in a relationship outside the scope of the utility's role as a common carrier, then *a fortiori*, it may, as Michigan Bell has done here, terminate its prior *billing* arrangements pursuant to the terms of a valid billings services agreement, while continuing to allow public access to the information provider's messages.

Given the Court's determination that, on the established law, defendant Michigan Bell may decline to provide either access or billing services to NetCom or any other information provider as a matter of *private business judgment*, plaintiff's burden here is to demonstrate a material issue of fact indicating that Michigan Bell did *not* terminate the 1988 BSA (pursuant to its terms) as a matter of business judgment and policy, *but rather* that the termination was *compelled* by the "coercive power" of the state.

Plaintiff has completely failed to allege specific factual claims raising a material issue as to such a claim. As the Ninth Circuit noted in *Southern Bell:*

> The Supreme Court's decisions also have made it clear that in order to establish state action the plaintiff must show that the state is responsible for the specific conduct of which he complains. [citing *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982).] "Faithful adherence to the state action requirement of the Fourteenth Amendment requires careful attention to the gravamen of the plaintiff's complaint." *Id.,* at 1003 [102 S.Ct. at 2785].

802 F.2d at 1357.

Apart from the fact that plaintiff's claim that defendant was somehow "coerced" into acting as a "stalking horse" for the Michigan Public Service Commission is painted in the broadest possible strokes, and is entirely unsubstantiated by specific factual allegations, such a theory requires the Court to reconcile certain undisputed facts in the record in a manner that is both completely speculative and fundamentally irrational.

According to the undisputed facts of record, three significant events occurred in early 1988 in short succession:

1) On January 12, 1988, plaintiff, defendant, the MPSC staff and other "intervenors" entered into a Settlement Agreement concerning a pending MPSC investigation involving defendant's SPS services.

On the same day, plaintiff and defendant signed the Mutual Release and Settlement Agreement (Mutual Release) and a Sponsored Program Services Billing Services Agreement (the 1988 BSA).

2) On February 4, 1988, approximately three weeks later, defendant announced its adoption of new "976/900 and Similar Services Guidelines," pursuant to which it would decline billing services for "objectionable" SPS programs, and pursuant to which six SPS vendors, including plaintiff, were sent notices of termination.

3) On February 23, 1988, the Michigan Public Service Commission *rejected* the Settlement Agreement of January 12, finding it inconsistent with the recently-announced 976/900 Guidelines issued by defendant.

In order to reconcile these three undisputed events with plaintiff's theory that defendant was coerced into acting as the "alter ego" or "stalking horse" for the MPSC staff, the Court would have to conclude that the Public Service Commission staff negotiated and entered into the Settlement Agreement with plaintiff and defendant, among others, on January 10, 1988, *knowing full well* that its "alter ego," Michigan Bell, would then announce *inconsistent* Guidelines for SPS services just three weeks later leading to termination of plaintiff's program, and with the *additional* knowledge that the MPSC itself would then be compelled to *reject* its own staff's Set-

tlement Agreement as inconsistent with defendant's new "976/900 and Similar Services Guidelines."

Such a reconciliation of plaintiff's "state action" theory and the cited events is both irrational, and contrary to the undisputed facts recited herein, compelling the Court to conclude that plaintiff has failed to raise any genuine issue of material fact supporting its allegation of prohibited state action infringing its First Amendment rights.

In conclusion, the Court finds on the undisputed facts that the 1988 Sponsored Program Services Billing Services Agreement signed by plaintiff and defendant on January 12, 1988 is a separate, valid and enforceable contract, and that plaintiff has failed to demonstrate a genuine issue of material fact as to the alleged breach of said billing services agreement, or any prior billing services agreement between the parties.

The Court further finds that defendant must be granted summary judgment on plaintiff's allegations under 42 U.S.C. § 1983 and the First and Fourteenth Amendments, for the reason that plaintiff has failed to demonstrate a genuine issue of material fact indicating that defendant's termination of billing and collection services for plaintiff's recorded message line on June 9, 1988 constituted impermissible state action or action "fairly attributable to the state."

For these reasons, IT IS HEREBY ORDERED that plaintiff's motion for summary judgment is DENIED and defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED.